United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

MARTHA VALENTINE, et al.,

             Plaintiffs,

      v.

CROCS, INC.,

             Defendant.

Case No.  22-cv-07463-TLT   (PHK)

**REDACTED ORDER ON DISCOVERY LETTER BRIEFS NOS. 4-6**

Re: Dkts. 70, 75, 79

Discovery Management Conference **SET** for August 16, 2024 at 1 PM

     This is a putative class action brought by Plaintiffs Martha Valentine, Ruby Cornejo, and Tiffany Avino (collectively "Plaintiffs") against Defendant Crocs, Inc. concerning "shoes that Defendant sells made of 90% or more Croslite® material."  [Dkt. 33 at ¶¶ 1-2].  The case has been referred to the undersigned for all discovery purposes.  *See* Dkt. 46.

     Now before the Court are three joint discovery letter briefs regarding ten disputes: (1) Plaintiffs' requests for production of Crocs' sales data; (2) Plaintiffs' request for production of Crocs' pricing documents; (3) Defendant's request for production of Plaintiffs' shoes for inspection; (4) Defendant's request for production of Plaintiffs' purchase receipts; (5) Defendant's request to depose Plaintiff Valentine in person in San Francisco; (6) Plaintiffs' request for

production of Crocs marketing materials; (7) Plaintiffs' request for production of Crocs' customer complaints relating to "small size;" (8) Plaintiffs' request for production of documents relating to how consumers use Crocs' products; (9) Plaintiffs' request for mold drawings of each model of Crocs' shoes; and (10) Plaintiffs' request for the Court to set a date for the deposition of Crocs employee Marco Piano.  [Dkts. 70, 75, 79].  The Court held a discovery hearing regarding these disputes on May 3, 2024 and, upon review of all briefing and arguments of counsel, now issues this Order.

### LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) delineates the scope of discovery in federal civil actions and provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Information need not be admissible to be discoverable.  *Id.*  Relevance for purposes of discovery is broadly defined to encompass "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350-51 (1978)); *see also In re Facebook, Inc. Consumer Privacy User Profile Litig.*, No. 18-MD-2843 VC (JSC), 2021 WL 10282215, at *4 (N.D. Cal. Sept. 29, 2021) ("Courts generally recognize that relevancy for purposes of discovery is broader than relevancy for purposes of trial.") (alteration omitted).

While the scope of relevance is broad, discovery is not unlimited.  *ATS Prods., Inc. v. Champion Fiberglass, Inc.*, 309 F.R.D. 527, 531 (N.D. Cal. 2015) ("Relevancy, for purposes of discovery, is defined broadly, although it is not without ultimate and necessary boundaries.").  Information, even if relevant, must be "proportional to the needs of the case" to fall within the scope of permissible discovery.  Fed. R. Civ. P. 26(b)(1).  The 2015 amendments to Rule 26(b)(1) emphasize the need to impose reasonable limits on discovery through increased reliance on the common-sense concept of proportionality: "The objective is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry.  The [proportionality requirement] is intended to encourage judges to be more aggressive in identifying and

1    discouraging discovery overuse."  Fed. R. Civ. P. 26 advisory committee's note to 2015

2    amendment.  In evaluating the proportionality of a discovery request, a court should consider "the

3    importance of the issues at stake in the action, the amount in controversy, the parties' relative

4    access to the information, the parties' resources, the importance of the discovery in resolving the

5    issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

6    Fed. R. Civ. P. 26(b)(1).

7          The party seeking discovery bears the burden of establishing that its request satisfies the

8    relevancy requirements under Rule 26(b)(1).  *La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer*,

9    285 F.R.D. 481, 485 (N.D. Cal. 2012).  The resisting party, in turn, has the burden to show that the

10   discovery should not be allowed.  *Id.*  The resisting party must specifically explain the reasons

11   why the request at issue is objectionable and may not rely on boilerplate, conclusory, or

12   speculative arguments.  *Id.*; *see also Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir.

13   1975) ("Under the liberal discovery principles of the Federal Rules defendants were required to

14   carry a heavy burden of showing why discovery was denied.").

15         The Court has broad discretion and authority to manage discovery.  *U.S. Fidelity & Guar.*

16   *Co. v. Lee Inv. LLC*, 641 F.3d 1126, 1136 n.10 (9th Cir. 2011) ("District courts have wide latitude

17   in controlling discovery, and their rulings will not be overturned in the absence of a clear abuse of

18   discretion."); *Laub v. U.S. Dep't of Int.*, 342 F.3d 1080, 1093 (9th Cir. 2003).  As part of its

19   inherent discretion and authority, the Court has broad discretion in determining relevancy for

20   discovery purposes.  *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005)

21   (citing *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002)).  The Court's discretion extends to

22   crafting discovery orders that may expand, limit, or differ from the relief requested.  *See*

23   *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (holding trial courts have "broad discretion to

24   tailor discovery narrowly and to dictate the sequence of discovery").  For example, the Court may

25   limit the scope of any discovery method if it determines that "the discovery sought is unreasonably

26   cumulative or duplicative, or can be obtained from some other source that is more convenient, less

27   burdensome, or less expensive."  Fed. R. Civ. P. 26(b)(2)(C)(i).

28         This case is still in the precertification stage.  The class certification discovery cutoff was

United States District Court
Northern District of California

3

April 26, 2024, with a class certification motion due on May 31, 2024. *See* Dkt. 59.
Precertification discovery lies entirely within the Court's sound discretion. *Artis v. Deere & Co.*,
276 F.R.D. 348, 351 (N.D. Cal. 2011) (citing *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d
935, 942 (9th Cir. 2009)). In the context of class certification, discovery must be limited so that it
does not place an undue burden on the opposing party. *Valentine v. Crocs, Inc.*, No. 22-cv-07463-
TNT (PHK), 2023 WL 7461852, at *1 (N.D. Cal. Nov. 10, 2023) (citing *Montano v. Chao*, No.
07-cv-00735-CMA-KMT, 2008 WL 5377745, at *3 (D. Colo. Dec. 19, 2008)). A court in its
sound discretion may permit limited and targeted non-burdensome discovery on class certification,
where the proponent demonstrates such discovery is in the interests of justice and consistent with
the language and spirit of Rule 23. *Id.* (citing *Mayo v. Hartford Life Ins. Co.*, 214 F.R.D. 465,
469-70 (S.D. Tex. 2002)). In analyzing precertification discovery disputes, the Court must
consider "the need for discovery, the time required, and the probability of discovery providing
necessary factual information." *Frost v. LG Electronics, Inc.*, No. 16-cv-05206-BLF, 2018 WL
11606311, at *4 (N.D. Cal. Mar. 29, 2018) (quoting *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d
1304, 1313 (9th Cir. 1977)).

The Court notes that, generally, discovery in a putative class action at the precertification
stage is limited to certification issues, such as the number of class members, the existence of
common questions, typicality of claims, and the representatives' ability to represent the class.
*Oppenheimer*, 437 U.S. at 359. Although discovery on the merits is usually deferred until it is
certain that the case will be allowed to proceed as a class action, "the merits/certification
distinction is not always clear" and "the two do overlap." *True Health Chiropractic Inc. v.
McKesson Corp.*, No. 13-cv-02219-JST, 2015 WL 273188, at *2 (N.D. Cal. Jan. 20, 2015); *see
Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (explaining that the "rigorous analysis"
under Rule 23(a) often "will entail some overlap with the merits of the plaintiff's underlying
claim. That cannot be helped."). In this case, discovery has not been bifurcated or phased. As
such, this Court is mindful that some leeway should be afforded with respect to merits-related
issues as part of the precertification discovery determination. Further, the Court is cognizant that
the current case schedule sets a comparatively shorter amount of time for fact discovery after the

United States District Court
Northern District of California

1    motion hearing on class certification, as compared to the period of time built into the schedule for

2    fact discovery prior to that hearing, which would support taking at least some merits-related

3    discovery during or as part of the precertification fact discovery period.  *See* Dkts. 25, 57.  The

4    Court now turns to the discovery disputes at hand and this Order incorporates by reference the

5    Court's verbal instructions and orders to the Parties at the May 3rd hearing.

**ANALYSIS**

6    

7    **I.    Sales Data**

8    　　　　The Parties' first dispute concerns Plaintiffs' discovery requests for all documents related

9    to sales of Crocs products during the class period both nationwide and in California specifically.

10   [Dkt. 70 at 1-4].  Plaintiffs complain that Defendant has only produced a "spreadsheet" of these

11   materials.  *Id.* at 1.  Plaintiffs argue that the spreadsheet is "plainly deficient" because: (1) it does

12   not include sales figures for the last three quarters of 2021 and "omits 2023 entirely;" (2) it uses an

13   "undefined method" to calculate annual total sales which "differs from net to gross;" (3) its

14   formatting is "unwieldy and unusable;" and (4) it does not include "California non-direct sales"

15   figures.  *Id.* at 1-2.  Plaintiffs argue that they are entitled to "complete information" regarding sales

16   of the Crocs products at issue during the relevant class period that is in a "useable" format.  *Id.* at

17   2.  Plaintiffs argue that it is "imperative" that they obtain this information prior to class

18   certification so that their expert can create an accurate damages model.  *Id.*  At the May 3rd

19   hearing, Plaintiffs argued that they particularly need the California sales data (including 2023 sales

20   figures) formatted to show "units sold."

21   　　　　Defendant argues that it has already produced "four master spreadsheets containing

22   multiple tabs" that provides "extensive sales data for multiple quarters during a five-year period

23   from the years 2018-2022, including the total units of Crocs shoes sold and monetary sales

24   numbers by shoe type."  *Id.* at 3.  Defendant states that the sales data already produced

25   encompasses "hundreds of millions of shoes."  *Id.*  Defendant states that it compiled sales data for

26   "all shoe types (as Plaintiffs requested)" and contends that "all data tied to Classic Bae and to

27   Classic Clogs sales over multiple years from the class period can be sorted out for review."  *Id.*

28   While acknowledging that "data tied to hundreds of millions of sales is inherently unwieldly,"

United States District Court

Northern District of California

1   Defendant argues that it should not be forced "to create additional spreadsheets to facilitate

2   Plaintiffs' damages models" at this stage of the case, or "to create documents that do not exist."

3   *Id.*

4          Parties seeking class certification "must be able to show that their damages stemmed from

5   the defendant's actions that created the legal liability." *Leyva v. Medline Indus. Inc.*, 716 F.3d

6   510, 514 (9th Cir. 2013) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013)).  To satisfy

7   this requirement, Plaintiffs must "establish[] that damages are *capable* of measurement on a

8   classwide basis." *Lytle v. Nutramax  Lab'ies, Inc.*, --- F.4th ----, 2024 WL 1710663, at *5 (9th

9   Cir. 2024) (quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 569 U.S. 27,

10  34 (2013)).  Plaintiffs need not "actually prove that classwide damages exist to obtain class

11  certification." *Id.* at *6.  For purposes of certifying a class, "class action plaintiffs may rely on an

12  unexecuted damages model to demonstrate that damages are susceptible to common proof so long

13  as the district court finds, by a preponderance of the evidence, that the model will be able to

14  reliably calculate damages in a manner common to the class at trial." *Id.*

15         At the May 3rd hearing, it became evident that the Parties' descriptions of what has and

16  has not been produced are at least inconsistent, if not contradictory.  After discussion with

17  counsel, the Court determined that Defendant's previously produced spreadsheet may lack

18  information on units sold for all time periods reported in that spreadsheet.  Accordingly, as stated

19  at the May 3rd hearing, the Court **ORDERS** Defendant to provide Plaintiffs with the "units sold"

20  information relating to any and all California sales data already produced by no later than **May 10,**

21  **2024**.  Further, at the hearing it appeared undisputed that Defendant has not produced a

22  spreadsheet reporting California sales data covering the entire 2023 calendar year.  Accordingly,

23  the Court further **ORDERS** Defendant to produce all available California sales data for the 2023

24  calendar year (formatted to include "units sold") by no later than **May 13, 2024**.

25         The Court finds that Plaintiffs' request for additional discovery of Crocs' sales data beyond

26  these parameters, even if relevant, is unduly burdensome and not proportional to the needs of the

27  case, particularly at this stage of the case and in light of the purported need Plaintiffs have for the

28  data with regard to their damages model.  In particular, at the hearing Plaintiffs did not

United States District Court
Northern District of California

substantially dispute Defendant's assertion that the spreadsheet previously produced already includes much of the data which Plaintiffs' motion argued was lacking.  This (among other areas discussed at the hearing and in this Order) demonstrates that counsel for the Parties could have and should have communicated more effectively and openly during the meet and confers prior to raising this dispute for resolution with the Court.  Accordingly, the Parties are **ORDERED** to file a Joint Status Report by no later than **May 13, 2024**, advising the Court as to the status of Defendant's production of the California sales data as ordered herein and at the hearing.

## II.   Pricing Documents

The Parties' second dispute concerns Plaintiffs' request for documents relating to the pricing of Crocs' products, including competitor pricing information.  [Dkt. 70 at 4-5].  Plaintiffs complain that Defendant has not produced any documents showing: (1) the "actual, market-clearing prices" for the Classic Clog and Classic Bae shoe styles; (2) "the factors Crocs uses to set its prices" for those products; or (3) "pricing for competing brands or products."  *Id.* at 4. Plaintiffs argue that such information is both "critical for the damages model" and "necessary to rebut common attacks on price premium damages models."  *Id.*

Defendant, in response, states that it has already produced "over 70,000 pages of documents and spreadsheets relevant to [Plaintiffs'] RFPs, culled from over a million documents captured by Plaintiffs' ESI searches, which included 'pricing' in the terms."  *Id.* at 5.  Defendant argues that Plaintiffs have not explained "why the MSRP and wholesale pricing data already produced would not provide their expert with sufficient information to identify the damages model that would be used to calculate class[]wide damages."  *Id.*  At the May 3rd hearing, Defendant suggested that it might be willing to stipulate in connection with class certification briefing that the pricing information already produced would be sufficient information for Plaintiffs' expert to create a damages model, without waiving arguments as to the adequacy or correctness of the model itself.

As stated at the May 3rd hearing, the Court **ORDERS** the Parties to promptly meet and confer regarding Defendant's potential stipulation as to the sufficiency of pricing data already produced (where any such stipulation would be due by May 25, 2024).

United States District Court
Northern District of California

1    The Court further **ORDERS** the Parties to promptly meet and confer to reach mutual

2    agreement on the defined "Products" at issue in this case, in light of the status of the case and the

3    impact of the Order on the most recent motion to dismiss.  *See* Dkt. 71.  The Parties shall report on

4    the status of these issues in their Joint Status Report due May 13, 2024.

5    The Court finds that Plaintiffs' request for additional pricing documents beyond that which

6    has already been produced is not proportional to the needs of the case, particularly at this stage of

7    the case and in light of the purported need for such discovery with regard to their damages model.

8    Accordingly, and in light of the potential stipulation the Parties are discussing, the request to

9    compel Defendant to perform a further search for additional pricing documents is **DENIED**.

10   ### III.    Plaintiffs' Shoes

11   The Parties' third dispute concerns Defendant's request to "measure, inspect, and

12   photograph" Plaintiffs' shoes at Crocs' headquarters in Colorado.  [Dkt. 75 at 1-3].  Plaintiffs

13   report that they are amenable to producing their shoes for inspection at Crocs headquarters but

14   request that Plaintiffs' attorney be physically present inside the room during the inspection and

15   further request that the inspection be videotaped.  *Id.* at 2.

16   Defendant opposes Plaintiffs' requests, stressing that Crocs intends to have its own counsel

17   present at the inspection "to be able to discuss issues related to the inspection with relevant

18   employees in a privileged setting."  *Id.*  Defendant argues that it is "entitled to inspect [Plaintiffs']

19   shoes in consultation with its counsel and knowledgeable employees" without being videotaped or

20   otherwise observed by Plaintiffs' counsel.  *Id.*  At the May 3rd hearing, Defendant's counsel

21   represented that its inspection would involve outside counsel, in-house counsel, and a consultant

22   who would attend by Zoom videoconference.

23   At the May 3rd hearing, the Parties confirmed that they have agreed on the location of the

24   inspection of Plaintiffs' shoes, as well as tentative dates for at least some of those inspections.  As

25   such, the Court **ORDERS** the Parties to comply with their agreement on those issues and to

26   promptly meet and confer regarding any remaining logistical and scheduling issues that remain

27   unresolved.

28   At the May 3rd hearing, the Parties continued to dispute (i) whether Plaintiffs' counsel can

8

be physically present inside the room where the inspection will take place during the inspections, and (ii) whether Plaintiffs can videotape the inspections.  As to the first issue, the request is denied.  Given that one of Defendant's participants in the inspection will be attending by videoconference, it is impractical to force Defendant's inspection team to step outside the room every time they wish to have a conversation which would be covered by the attorney-client privilege and/or the work product doctrine.  The Court is cognizant of the public policy reasons supporting the attorney-client privilege and work product doctrines.  *See Baird v. Koerner*, 279 F.2d 623, 629 (9th Cir. 1960) ("While it is the great purpose of law to ascertain the truth, there is the countervailing necessity of [e]nsuring the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.").  While obviously Plaintiffs' counsel can be present at the start of the inspection to deliver the shoes (and to confirm the video camera, discussed below, is set up appropriately) as well as at the end of the inspection to retrieve the shoes, Plaintiffs' counsel shall leave the room during the inspection and may reenter only after the inspection is complete (unless the Parties agree otherwise).

The Court however is sensitive to the fact that Plaintiffs' shoes are one-of-a-kind evidence unique to each named Plaintiff.  To address Plaintiffs' concerns regarding evidence preservation for these shoes in particular, the Court **ORDERS** Defendant to retain and bring a videographer (at Defendant's cost) to videotape (but not audio record) the inspection so that there will be a visual record of the inspection.  Defendant shall provide a copy of this Order to any such videographer and shall coordinate with Plaintiffs in the set-up, lighting, width, and shot angle for the video camera in the inspection room so that the videographer's camera captures a reliable visual record of what happens to the shoes during the inspection.  The Parties agreed that the inspection contemplated is not destructive of the shoes and consists basically of photographing and taking measurements of various features of the shoes using some form of a 3D modelling tool (and perhaps 2D measuring of various dimensions).  As instructed at the hearing, Defendant's counsel shall ensure that only non-destructive measuring, inspecting, and photographing takes place during the inspection of the shoes.  The videographer shall sign a declaration beforehand that they will

9

disconnect/mute the microphones and not record any conversations or audio which takes place during the inspection, and attest that they did so after the inspection is completed.  In this way, the Court seeks to ensure that Defendant's concerns about privileged conversations are addressed. Defendant's counsel is entitled to watch a sample playback of the video recording to make sure no audio is recorded.

If, after the inspection is complete and Plaintiffs' shoes are returned to Plaintiffs' possession, Plaintiffs' counsel in good faith reasonably believes that the shoes suffered physical damage, destruction, and/or material alteration while in Defendant's custody and control during the inspection, Plaintiffs' counsel may request a meet and confer with Defendant's counsel regarding the issue and then demand production of the video recording of the inspection to confirm whether or not any physical destruction or alteration of the shoes took place at the hands of Defendants' inspection team during the inspection.  The Court instructed the Parties at the hearing to take all reasonable, cooperative steps to minimize the risk that any such dispute will occur.

### IV.    Plaintiff Valentine's Receipts

The Parties' fourth dispute concerns Defendant's request for production of "[a]ll receipts for any Crocs Shoes purchased and/or used by [Plaintiffs] during the class period."  [Dkt. 75 at 3-4].  Defendant complains that "Plaintiff Valentine's receipt from her eBay purchase of Crocs shoes is blurry and cut-off, and does not identify the seller."  *Id.*  Defendant asks the Court to order Plaintiff Valentine "to produce all receipts from her purchase, which should be able to be located from her email, showing the identity of her eBay seller and the information on her purchased shoes."  *Id.* at 4.

As to this issue, Plaintiffs argue that "Plaintiff Valentine has already conducted an email search for relevant documents to this case" and produced "the receipt[] available to [her]," which identifies the eBay seller by the user/account name of "botterboynova."  *Id.*  Plaintiffs state that they "are happy to reproduce" Plaintiff Valentine's purchase receipt to the extent that the document is "blurry."  *Id.*

To the extent that they have not already done so, the Court **ORDERS** Plaintiffs to

reproduce a non-blurry copy of Plaintiff Valentine's eBay receipt by no later than **May 10, 2024**.

At the May 3rd hearing, it became evident that Plaintiffs' counsel relied solely on Plaintiff Valentine herself to search her own emails for the requested receipt.  It is undisputed that no records from Plaintiff Valentine's eBay account were produced (and they appear not to have been searched).  Given the limited nature of what is requested, Plaintiffs' counsel's reliance on a non-lawyer to conduct an unsupervised search for responsive emails and eBay account records is inadequate in the circumstances here, and particularly in light of Defendant's raising of these issues during the meet and confers.  *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 16-cv-06370-EJD (VKD), 2020 WL 2838806 at *5-6 (N.D. Cal. June 1, 2020) ("The Court does not conclude that counsel must always personally conduct or directly supervise a client's collection, review, and production of responsive documents.  However, in the circumstances presented here, the Court finds that [counsel] Sheppard Mullin did not make a reasonable effort to ensure that [its client] Ningbo Sunny produced all the documents responsive to [opposing party] Orion's requests and thus violated its obligations under Rule 26(g)(1)(B)").  Further, the burden of searching Plaintiff Valentine's email account and eBay account is minimal because Plaintiffs' counsel knows the date of the purchase and the name of the eBay seller, and accordingly, the request is proportional as well to the needs of the case.  Accordingly, Plaintiffs' counsel themselves are **ORDERED** to search promptly both Plaintiff Valentine's email account and Plaintiff Valentine's eBay account for all emails, communications, receipts, payment and shipping records or confirmations, and any other electronic records of the transaction between Plaintiff Valentine and the eBay seller regarding the purchase and shipment/receipt of her Crocs shoes at issue in this case.  Plaintiffs' counsel shall produce all emails, records, and electronic documents found after such search by no later than **five business days** in advance of Plaintiff Valentine's deposition date. The Parties shall report the status of this issue in their Joint Status Report due May 13, 2024.

### V.    Depositions of the Named Plaintiffs

The Parties' fifth dispute concerns Defendant's request to take Plaintiffs' "live depositions in San Francisco, where they brought this lawsuit." [Dkt. 75 at 4-5].  Defendant complains that opposing counsel only very recently informed them that Plaintiffs Avino and Valentine "may not

United States District Court
Northern District of California

be available to schedule any deposition—live or video—before the end of class discovery." *Id.* at 4. The Parties have apparently agreed on a tentative deposition date for Plaintiff Avino (May 14, 2024) but not as to Plaintiff Valentine. *Id.* at 4-5. Defendant asks the Court to approve the deposition date for Plaintiff Avino and to compel Plaintiffs' counsel to specify a date in May 2024 for Plaintiff Valentine's deposition. *Id.* Defendant also requests that Plaintiff Valentine "be Ordered to appear for her deposition in person in San Francisco (where she resides) unless she provides Crocs with evidence that she will be out of the country through May 24." *Id.* at 5.

Both in the briefing and at the May 3rd hearing, Plaintiffs argued that there is no actual dispute on these issues and that the Parties are merely involved in discussing the final logistics and scheduling of these depositions. At the May 3rd hearing, it became apparent that Defendant insisted that Plaintiff Valentine be deposed in person in San Francisco, despite the representation from Plaintiffs' counsel that she is travelling out of the country throughout the month of May and counsel's offer for her to be deposed by Zoom videoconference. Again, the Court is disappointed that the Parties were unable to reasonably cooperate and discuss these kinds of issues and required the Court to rule on what amount to scheduling disputes.

### a. Depositions of Named Plaintiffs Avino and Cornejo

To the extent that the Parties have agreed on locations and dates for the depositions of Plaintiffs Avino and Cornejo, the Court **ORDERS** the Parties to comply with their agreement. At the risk of repetition, the Court admonishes the Parties yet again to work more diligently on cooperating in discovery consistent with the Court's instructions provided months ago in this case.

### b. Deposition of Named Plaintiff Valentine

Plaintiffs' counsel shall provide to Defendant's counsel promptly a sworn declaration under penalty of perjury under the laws of the United States and the State of California executed by Plaintiff Valentine by no later than 5 p.m. (PT) on **May 10, 2024** attesting that she will remain outside of the United States during all of May 2024, and further identifying all the dates she is travelling outside of the country in May and June. If such a declaration is provided by the deadline, then the Court **ORDERS** that Plaintiff Valentine shall make herself available for deposition by Zoom videoconference (and that deposition shall be taken) on a date agreed upon

between the Parties by no later than May 29, 2024 (and to be taken during normal daytime business hours in the foreign location where Plaintiff Valentine is located, or at any other time of day as agreed upon by the Parties).  If no such declaration is served by the May 10 deadline, the Court **ORDERS** that Plaintiff Valentine shall present herself for an in-person deposition in San Francisco during at least the final week of May 2024.  By no later than **May 10, 2024**, Plaintiffs shall provide all dates Plaintiff Valentine is available to be deposed through May 29, 2024 (and indicate whether she is available in-person or by Zoom on each such available date), excluding May 10, 2024 and May 14, 2024.  Defendants shall notice Plaintiff Valentine's deposition promptly thereafter, and the Parties shall cooperate diligently to ensure that the deposition is completed by May 29, 2024 at the latest.  The Parties are **ORDERED** to cooperate diligently and reasonably on arranging promptly the logistics (whether in-person or by Zoom), timing, and scheduling of Plaintiff Valentine's deposition consistent with this Order.

### c.   Plaintiff Valentine's Shoes

At the May 3rd hearing, in connection with Plaintiff Valentine's deposition and the dispute concerning inspection of shoes, the Parties reported a dispute that they did not expressly brief to the Court in the Joint Discovery Letters, concerning the present status and location of Plaintiff Valentine's shoes.  Defendants argued that they have asked for and been unable to receive any concrete information from Plaintiffs on the delivery for inspection of Plaintiff Valentine's Crocs shoes at issue in this case.

Plaintiffs' counsel informed the Court that they believe Plaintiff Valentine's Crocs shoes (which are the basis for her claims in this case) are in Plaintiff Valentine's apartment in San Francisco, but counsel indicated they are unable to obtain those shoes because Plaintiff Valentine has been and is presently travelling outside of the country at least through the entire month of May 2024, as discussed above.

Plaintiff Valentine has had notice of the request for her shoes, as has her counsel, for months, and the Court is not persuaded that there has been good cause for the delay in obtaining those shoes.  Given Plaintiffs' counsel's concerns about the named Plaintiffs' shoes being one-of-a-kind evidence as discussed above, the Court finds that the failure to obtain Plaintiff Valentine's

United States District Court
Northern District of California

1  shoes thus far is inconsistent with Plaintiffs' counsels arguments about the value of that alleged

2  one-of-a-kind evidence and thus undermines the credibility of any such arguments.  If Plaintiff

3  Valentine is and has been on an extended overseas trip, it is likely that someone (a family member,

4  landlord, or friend) has a key or ability to access her apartment.  The fact that Plaintiffs' counsel

5  has not investigated how to get into the apartment even as late as the May 3rd hearing

6  demonstrates an unexplained and credibility-undermining lack of diligence.

7       As discussed at the May 3rd hearing, the Court **ORDERS** Plaintiffs' counsel to promptly

8  communicate with Plaintiff Valentine (or any of her family members or others who may have

9  access to the apartment) to determine whether there is any individual with the ability to access

10  Plaintiff Valentine's apartment who can locate and obtain the shoes at issue (or provide that access

11  to Plaintiffs' counsel).  The Parties shall report on the status of this issue in their Joint Status

12  Report due May 13, 2024.

13  **VI.    Marketing Materials**

14       The Parties' next dispute concerns Plaintiffs' request for Crocs' marketing materials.  [Dkt.

15  79 at 1-3].  Plaintiffs argue that "marketing materials are now plainly relevant to this case," in

16  light of the Court's April 8, 2024 Order denying Defendants' renewed motion to dismiss and

17  allowing Plaintiffs' false advertising claims to proceed.  *Id.* at 1; *see* Dkt. 71.  Plaintiffs argue that

18  the discovery sought is proportional to the needs of the case, because the Court's April 8, 2024

19  Order "also expanded the case to include *all* Crocs shoes made of 90% or more Croslite."  [Dkt.

20  79 at 1].  Plaintiffs argue that Defendant's production of marketing materials thus far is deficient,

21  because the Parties' ESI search terms "were negotiated *prior* to the Court's recent opinion," and

22  because the search terms were run solely on emails even though "Crocs' practice was to send

23  various reports via hyperlinks, not as attachments."  *Id.*

24       Defendant argues that Plaintiffs' request for additional marketing materials is

25  "unreasonably cumulative and duplicative," stressing that they have already produced nearly

26  "80,000 pages of documents and spreadsheets" in this litigation.  *Id.* at 2.  While amenable to

27  conducting "a reasonable search for specific hyperlinked documents," Defendant argues that it

28  should not be required to "manually review its entire 80,000 page production to search for

14

hyperlinks" or to "conduct[] searches prior to class certification" for additional materials. *Id.* at 2-3.

At the May 3rd hearing, the dispute here centered on certain marketing reports from certain third-party vendors: (1) ███████ (which apparently merged recently with another vendor named ████); and (2) ████████. It is undisputed that Defendant received regular quarterly marketing reports from some or all of these vendors (in particular, ███████) but has not produced them. Given the targeted nature of the request, the Court finds that the request for Defendant to search for and produce these specific third-party reports (covering the purported class period) is proportional. The fact that Defendant's ESI has resulted in the production of at least one document referencing or summarizing some ████ data also supports the Court's finding that these reports are relevant for purposes of discovery. The Court recognizes that the Parties retain their arguments regarding the weight and impact of these reports for purposes of the class certification issues. The issue the Court resolves herein is whether these reports are discoverable, not their ultimate relevance or the weight of such evidence.

Accordingly, as stated at the May 3rd hearing, the Court **ORDERS** Defendant to produce one copy of each and every quarterly (or monthly or annual or biannual) market report received by Defendant from third-party vendors including ████████████████████ for the putative class period (to the extent such materials have not already been produced) by no later than **May 17, 2024**.

At the May 3rd hearing, the only remaining dispute regarding marketing documents related to the so-called "Category Playbook" materials. The Parties appear to have insufficiently met and conferred over whether there remains a dispute as to this issue, because the Parties were unable to inform the Court as to whether this is a regularly created/produced document or not, whether this document comes from a third party, and whether there even exist any other materials or documents related to the one document apparently produced. Accordingly, the Court further **ORDERS** the Parties to promptly meet and confer on this dispute. The Parties shall advise the Court as to the status of these issues in their Joint Status Report due May 13, 2024.

## VII.    Customer Complaints Regarding "Small Size"

The Parties' next dispute concerns Plaintiffs' request for Crocs' customer complaints regarding "small size" of Crocs shoes.  [Dkt. 79 at 3-4.]  Plaintiffs argue that Defendant's previously produced a spreadsheet of customer complaints regarding shrinkage but that spreadsheet "does not include complaints about small size, which is a top complaint." *Id.* at 3. Plaintiffs argue that complaints about "small size" of shoes are, in fact, the result of shrinkage and thus are likely evidence of additional complaints about their shoes' shrinkage (even if the complaints do not expressly refer to shrinkage).  *Id.*  Plaintiffs argue that discovery into customer complaints regarding small size will enable them to directly rebut Defendant's assertion "that complaints about shrinkage represent a small percentage of overall complaints."  *Id.*

Defendant argues that the common cause for complaints about "small size" of Crocs shoes are the result of the fact that Crocs does not offer shoes in half-sizes, which is unrelated to shrinkage.  Defendant thus argues that this request is both overbroad, and that the burden of having to search for and compile yet another spreadsheet of complaints is not justified.

As stated at the May 3rd hearing, the Court **DENIES** Plaintiffs' request to require Defendant to produce a spreadsheet of all the data relating to all additional customer complaints which use the phrase "small size."  As discussed at the hearing, searching for such data entails burdens which, when viewed in the context of other discovery already produced, are not sufficiently rebutted, and the request is not proportional to the needs of the case.

At the May 3rd hearing, Plaintiffs suggested that their concerns about their ability to rebut Defendant's assertions about the nature of complaints could be addressed if they receive simply the number of complaints about "small size" as opposed to all the data underlying each such complaint.  Because this narrowed request addresses the concerns as to proportionality and because merely obtaining a "hit count" search entails relatively minimal burden on Defendant, the Court **ORDERS** Defendant to run a search in their database for complaints which contain the search term "small size" and provide Plaintiffs with a "hit count" identifying the total number of customer complaints resulting from such search by no later than **May 10, 2024**.

## VIII.   Documents Relating to Product Use

The Parties' eighth dispute concerns Plaintiffs' request for documents relating to "how consumers use [Crocs] products, and whether consumers use [Crocs] shoes in hot and sunny environments."  [Dkt. 79 at 4].  Defendant argues that Crocs has already produced all responsive documents relating to marketing materials (a number of which already apparently address the issue here) and deny the existence of any "internal consumer data relating to how consumers are using the shoes."  *Id.*

The Court **DENIES** Plaintiffs' request for an order requiring Defendant to perform a further search for and produce additional documents regarding how customers use Crocs products. Given the negotiated and agreed upon ESI search terms and the number of documents already produced, Plaintiffs' request is not proportional to the needs of the case.  "[P]erfection in ESI discovery is not required; rather a producing party must take reasonable steps to identify and produce relevant documents."  *Alivecor, Inc. v. Apple, Inc.*, No. 21-cv-03958-JSW, 2023 WL 2224431, at *2 (N.D. Cal. Feb. 23, 2023) (citing *Reinsdorf v. Skechers U.S.A, Inc.*, 296 F.R.D. 604, 615 (C.D. Cal. 2013) ("[W]hile parties must impose a reasonable construction on discovery requests and conduct a reasonable search when responding to the requests, the Federal Rules do not demand perfection.")).

## IX.   Mold Drawings

The Parties' ninth dispute concerns Plaintiffs' request for mold drawings of each model of Crocs shoe.  [Dkt. 79 at 4-5].  Plaintiffs argue that they need "an exemplar of mold drawing of each model of shoe" to be able to "rebut any contentions that the shoes did not shrink."  *Id.* at 4. Defendant argues that Plaintiffs' request for mold drawings is "premature" at best, stressing that Crocs' mold drawings "fit squarely within the definition of a trade secret."  *Id.* at 5.

As an initial matter, to the extent that Defendant raised concerns regarding trade secrets, the Court notes that there is a Protective Order governing discovery in this case which directly addresses trade secret issues and confidentiality.  *See* Dkt. 28.  The Court therefore overrules and rejects Defendant's arguments on this basis as moot and not well-founded.

At the May 3rd hearing, it became apparent that the mold drawings are production

17

1    schematics for Crocs shoes used at the factory.  While Defendant argued that Plaintiff can simply

2    purchase and measure all the dimensions of any Crocs shoe available on the market, according to

3    Plaintiffs' counsel the mold drawings indicate dimensions ████████████████████

4    ████████████████████████████████████████████████████████████.

     Further, the mold drawings appear to provide more dimensions for different features and locations

5

6    on the shoes than the documents produced to date, and thus are not duplicative.  At the hearing,

7    Plaintiffs again limited their request to one exemplar mold drawing.  The Court finds that the

8    request as narrowed is proportional to the needs of the case.

9          As stated at the May 3rd hearing, the Court **ORDERS** Defendant to produce promptly one

10   exemplar mold drawing for at least the Classic Clog and the Bae as made and sold during the

11   putative class period.  Defendant shall also identify to Plaintiffs' counsel the commercial software

12   needed to access the mold drawings, assuming the mold drawings are produced in electronic

13   format from a CAD/CAM system.  After Plaintiff reviews the mold drawings, if Plaintiff identifies

14   a reasonable basis for requesting additional mold drawings for identified models/styles of Crocs

15   shoes at issue, the Court **ORDERS** the Parties to meet and confer on reaching agreement for

16   production of a reasonable number of additional mold drawings for specific identified models of

17   Crocs shoes at issue in this case, including discussion of whether the Parties can reach agreement

18   on whether any model is representative of all (or at least some of) the other models of Crocs shoes

19   at issue in this case for purposes of discussions concerning dimensions, measurements, and

20   features of the shoes (or any other purposes the Parties may agree upon).

21         The Parties shall advise the Court as to the status of these issues in their Joint Status Report

22   due May 13, 2024.

23   **X.    Marco Piano Deposition**

24         The Parties' final dispute concerns Plaintiffs' request to depose one of Crocs' employees,

25   Marco Piano.  [Dkt. 79 at 5].  At the May 3rd hearing, Plaintiffs confirmed that they wish to

26   depose Mr. Piano as a fact witness (not a Rule 30(b)(6) witness).  Plaintiffs confirmed their

27   willingness to depose Mr. Piano via Zoom videoconference given that Mr. Piano works and

28   resides in Italy.  Plaintiffs further confirmed their willingness to provide an Italian translator for

1   Mr. Piano's deposition (at Plaintiffs' expense).

2          Defendant's arguments appear to based on an assumption that Plaintiffs are seeking to

3   force Defendant to designate Mr. Piano as an addition Rule 30(b)(6) witness.  Had the Parties been

4   more forthcoming in their positions during the meet and confers, this entire dispute could have

5   been avoided.

6          As stated at the May 3rd hearing, the Court **ORDERS** the Parties to promptly meet and

7   confer for purposes of setting a date during the last week of May for Mr. Piano's deposition to be

8   taken via Zoom videoconference.  At the hearing, Defendant's counsel suggested that the specific

9   information Plaintiffs seek from Mr. Piano's deposition may be more readily provided by

10  supplemental interrogatory responses.  To the extent that the Parties are able to obviate the need

11  for this deposition or to reduce the time needed for this deposition, the Court further **ORDERS** the

12  Parties to promptly meet and confer on this issue.

13         The Parties are **ORDERED** to cooperate diligently and reasonably on arranging promptly

14  the Zoom logistics, timing, and scheduling of Mr. Piano's deposition consistent with this Order.

15  The Parties shall report to the Court as to the status of Mr. Piano's deposition in their Joint Status

16  Report due May 13, 2024.

17                                          **CONCLUSION**

18         Many of the disputes raised in the instant Discovery Letter Briefs [Dkts. 70, 75, and 79]

19  and resolved herein are issues which the Court expects able and experienced counsel to be capable

20  of resolving through negotiation without the need for Court intervention.  The Court is

21  disappointed that there was evidently insufficient communication between counsel during the

22  mandatory meet and confers, given the uncertainty as to facts on several of the disputes and

23  proposals raised for the first time at the May 3rd hearing.  If the Parties continue to demonstrate

24  inability to resolve discovery disputes in a reasonable manner consistent with Federal Rules of

25  Civil Procedure 1 and 26 (as well as this Court's Orders), the Court will consider imposing

26  additional meet and confer procedures for future discovery disputes, including but not limited to

27  requiring any counsel directly involved in any of the meet and confers to meet and confer in

28  person, requiring in-person meet and confers by lead trial counsel regardless of lead counsels'

United States District Court
Northern District of California

geographic proximity, requiring meet and confers to take place in person at the San Francisco courthouse, requiring in-house counsel or Party representatives (or Parties themselves, if any are natural persons) to attend all meet and confers, and/or the imposition of appropriate sanctions (including monetary sanctions) for failure to adequately and reasonably meet and confer.

The disputes raised by the Joint Discovery Letters [Dkts. 70, 75, 79] and the new disputes raised at the May 3rd hearing are **RESOLVED** as either ordered herein or withdrawn as discussed herein.

**IT IS SO ORDERED.**

Dated:  May 8, 2024

_____
PETER H. KANG
United States Magistrate Judge