**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Anthony J. Patek (State Bar No. 228964)
  anthony@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone:  (415) 639-9090
Facsimile:  (415) 449-6469

Patrick J. Branson (*pro hac vice*)
  patrick@gutridesafier.com
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTHA VALENTINE, RUBY CORNEJO, TIFFANY AVINO, each an individual, on behalf of themselves, the general public, and those similarly situated,<br><br>                              Plaintiffs,<br><br>     v.<br><br>CROCS, INC.,<br><br>                              Defendant. | Case No. 3:22-cv-07463-TLT<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br><u>MOTION HEARING</u><br><br>DATE:       September 24, 2024<br>TIME:        2:00 p.m.<br>CTRM:      9 (19th Floor)<br><br>Hon. Trina L. Thompson |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE THAT** on September 24, 2024 at 2:00 p.m., or as soon thereafter as the matter may be heard by the Honorable Trina L. Thompson of the United States District Court for the Northern District of California, located in Courtroom 9 at 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiffs Ruby Cornejo and Tiffany Avino, by and through their undersigned counsel of record, will and hereby do move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to certify the following classes:

> **Class**: All persons who purchased, in the state of California, the Products[1] from Crocs and its authorized retailers[2] from November 22, 2018 to the present (the "Class").[3]

> **Direct Purchase Subclass**: All Class Members who purchased the Products directly from Crocs (either online or in-person) (the "Subclass").

The Class and Subclass will pursue claims against Defendant Crocs, Inc. on theories that Defendant's conduct (1) breached an implied warranty of merchantability (Cal. Com. Code § 2314); (2) violated the Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL")); and (3) was deceptive, misleading, and/or fraudulent under the CLRA, the California False Advertising Law (Cal. Bus. & Prof. Code §§ 17500 et seq. ("FAL")), and the common law.

Plaintiffs further request that the Court (1) appoint Plaintiffs Ruby Cornejo and Tiffany Avino as class representatives on all claims for the Class, (2) appoint Plaintiff Tiffany Avino as class representative for all claims for the Subclass, and (3) appoint Gutride Safier LLP as class counsel. Plaintiffs finally request that the Court order the parties to meet and confer and present this Court, within fifteen (15) days of an order granting class certification, a proposed notice to the certified class.

---

[1] The "Products" are all sizes and colors sold during the class period of the following Crocs shoes: Classic Clog; Classic Clog (kids); Classic Clog (toddlers); Classic Tie Dye Clog; Bayaband Clog; and Baya Clog.

[2] Authorized retailers are third-party retailers that Crocs authorized to sell the Products. *See* Ex. 46, Ex. 25 at 58:15–19. A list of authorized retailers appears at Ex. 46.

[3] Plaintiffs request to exclude from the proposed Class the following:
Excluded from the Class are members of the judiciary, governmental entities, Defendant, any entity in which it has a controlling interest, and its officers and directors, and members of their immediate families, non-natural persons, and purchases for purposes of resale and purchases that were returned to the seller for a full refund.

This Motion is based on Rule 23 of the Federal Rules of Civil Procedure, the supporting Memorandum and Points and Authorities herein, and accompanying Declarations in support of Class Certification by the following persons:

- Kali Backer;
- Seth Safier;
- J. Michael Dennis;
- Colin Weir;
- Steven Gaskin; and
- Michael Hickner.

In the Memorandum of Points and Authorities that follows, these declarations shall be referred to by the last name of the declarant, followed with the abbreviation "Decl." (for example: "Backer Decl."). This Motion is also based on the pleadings and papers on file in this action, and any other matter of which this Court may take judicial notice.

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ......................................................................... i
TABLE OF CONTENTS ........................................................................................... iii
TABLE OF AUTHORITIES ..................................................................................... iv
I.      INTRODUCTION ........................................................................................ 1
II.     STATEMENT OF FACTS ........................................................................... 2
        A.      The Products. ................................................................................... 2
        B.      The Defect. ....................................................................................... 3
        C.      Crocs Knew of the Common Shrinkage Defect ████████. ................ 3
        D.      Crocs' Efforts to Address Shrinkage Have Been Ineffective. .......... 6
                1.      ████████████████████████████████████
                        ................................................................................ 6
                2.      Crocs Chose Not to ████████████████████████. ........... 7
        E.      Crocs Failed to Warn Consumers About the Risk of Shrinkage. ...... 8
        F.      Crocs Received Thousands of Complaints. ...................................... 9
        G.      Crocs Knew That Fit Is the Top Reason Consumers Buy the Products. ....... 10
        H.      Crocs' Omission of the Defect Misled Consumers. ....................... 11
        I.      Crocs Charged a Price Premium Because It Sold Defective Shoes. .... 11
III.    ARGUMENT ............................................................................................. 12
        A.      The Class Satisfies the Requirements of Rule 23(a). ..................... 12
                1.      The Class is Sufficiently Numerous. ................................. 12
                2.      There Are Common Questions of Fact and Law. .............. 12
                3.      Plaintiffs Are Typical of the Class. .................................. 13
                4.      Plaintiffs and Counsel Will Adequately Represent the Class. ...... 14
        B.      The Class Satisfies the Requirements of Rule 23(b)(3). ................ 15
                1.      Common Questions Predominate Under the Class's Implied Warranty Claim. ..... 16
                2.      Common Questions Predominate Under the CLRA, UCL Fraud Prong, and
                        Common Law. ................................................................... 19
                        a.      Common Questions Predominate as to the Existence of the Defect. ......... 19
                        b.      Common Questions Predominate as to the Duty to Disclose. ................. 20
                        c.      Common Question Predominate on Consumer Deception. ...................... 21
                        d.      Common Questions Predominate as to Materiality and Reliance. ............ 21
                3.      Common Questions Predominate on Restitution and Damages. ......... 23
                4.      A Class Action is Superior. ............................................... 25
IV.     CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Alger v. FCA US LLC*,
   334 F.R.D. 415 (E.D. Cal. 2020) ................................................................................. 19, 21

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ................................................................................................................ 20

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) ................................................................................................. 12

*Astiana v. Kashi Co.*,
   291 F.R.D. 493 (S.D. Cal. 2013) ....................................................................................... 14, 15

*Bailey v. Rite Aid Corp.*,
   338 F.R.D. 390 (N.D. Cal. Apr. 28, 2021) ............................................................................. 24

*Berger v. Home Depot USA, Inc.*,
   741 F.3d 1061 (9th Cir. 2014) ................................................................................................ 19

*Bradach v. Pharmavite, LLC*,
   735 F. App'x 251, 2018 U.S. App. LEXIS 12820 (9th Cir. May 17, 2018) .......................... 21

*Butler v. Porsche Cars N. Am., Inc.*,
   No. 16-CV-2042-LHK, 2017 U.S. Dist. LEXIS 59952 (N.D. Cal. Apr. 19, 2017) ............... 22

*Carnegie v. Household Int'l, Inc.*,
   376 F.3d 656 (7th Cir. 2004) ................................................................................................. 25

*Chamberlain v. Ford Motor Co.*,
   402 F.3d 952 (9th Cir. 2005) ................................................................................................. 19

*Chavez v. Blue Sky Nat. Bev. Co.*,
   268 F.R.D. 365 (N.D. Cal. 2010) .......................................................................................... 14

*Collins v. eMachines, Inc.*,
   202 Cal.App.4th 249 (2011) ............................................................................................. 19, 20

*Comcast v. Behrend*,
   133 S. Ct. 1426 (2013) ........................................................................................................... 23

*Cordes v. Boulder Brands USA, Inc.*,
   No. CV 18-6534 PSG (JCx), 2019 WL1002513 (C.D. Cal. Jan. 30, 2019) .......................... 14

*Daniel v. Ford Motor Co.*,
   806 F.3d 1217 (9th Cir. 2015) ........................................................................................... 19, 22

*Daniel v. Ford Motor Co.*,
   No. 2:11-02890 WBS EFB, 2016 U.S. Dist. LEXIS 130745 (E.D. Cal. Sep. 23, 2016) ....... 20

*Dei Rossi v. Whirlpool Corp.*,
   No. 2:12-CV-00125-TLN, 2015 WL 1932484 (E.D. Cal. Apr. 28, 2015) ............................. 22

*Dukes v. Wal-Mart, Inc.*,
   509 F.3d 1168 (9th Cir. 2007) ................................................................................................ 13

*Edwards v. Ford Motor Co.*,
   603 F. App'x 538 (9th Cir. 2015) ...................................................................................... 19, 21

*Falk v. GMC*,
   496 F. Supp. 2d 1088 (N.D. Cal. 2007) ................................................................................. 20

*Hadley v. Kellogg Sales Co.*,
   324 F. Supp. 3d 1084 (N.D. Cal. 2018) ............................................................................. 22, 24

iv

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ........................................................................................ 12

*Huu Nguyen v. Nissan N. Am., Inc.*,
   932 F.3d 811 (9th Cir. 2019) ..................................................................................... 13, 17

*In re Arris Cable Modem Consumer Litig.*,
   327 F.R.D. 334 (N.D. Cal. 2018) ......................................................................... 20, 23, 24

*In re Hyundai & Kia Fuel Econ. Litig.*,
   926 F.3d 539 (9th Cir. 2019) ........................................................................................ 16

*In re Macbook Keyboard Litig.*,
   No. 5:18-cv-02813-EJD, 2021 U.S. Dist. LEXIS 65812 (N.D. Cal. Mar. 8, 2021) ............ 14

*In re NJOY, Inc. Consumer Class Action Litig.*,
   120 F. Supp. 3d 1050 (C.D. Cal. 2015) .......................................................................... 22

*In re Sony Vaio Comput. Notebook Trackpad Litig.*,
   No. AJB 09cv2109 AJB (MDD), 2013 U.S. Dist. LEXIS 194010 (S.D. Cal. Sep. 25, 2013) ............ 17

*In re Tobacco II Cases*,
   46 Cal.4th 298 (2009) ................................................................................................... 19

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*,
   754 F. Supp. 2d 1145 (C.D. Cal. 2010) .......................................................................... 18

*Johnson v. Nissan N. Am., Inc.*,
   No. 3:17-cv-00517-WHO, 2022 U.S. Dist. LEXIS 131657 (N.D. Cal. July 21, 2022) ........... 20, 21, 24

*Just Film, Inc. v. Buono*,
   847 F.3d 1108 (9th Cir. 2017) ................................................................................ 13, 18, 19

*Kasky v. Nike, Inc.*,
   27 Cal. 4th 939 (2002) .................................................................................................. 21

*Kaupelis v. Harbor Freight Tools USA, Inc.*,
   No. SACV 19-1203 JVS (DFMx), 2020 U.S. Dist. LEXIS 186249 (C.D. Cal. 2020)............ 14, 23, 24

*Kumar v. Salov N. Am. Corp.*,
   No. 14-CV-2411- YGR, 2016 U.S. Dist. LEXIS 92374 (N.D. Cal. July 15, 2016)................... 21, 22

*Lytle v. Nutramax Labs., Inc.*,
   No. 22-55744, 2024 U.S. App. LEXIS 9722 (9th Cir. Apr. 22, 2024)................................. 23, 24, 25

*Maldonado v. Apple, Inc.*,
   333 F.R.D. 175 (N.D. Cal. 2019)................................................................................... 23

*McCrary v. Elations Co., LLC*,
   No. EDCV 13-00242 JGB (OPx), 2014 U.S. Dist. LEXIS 8443 (C.D. Cal. Jan. 13, 2014) ............... 15

*McGill v. Citibank, N.A.*,
   2 Cal. 5th 945 (2017) .................................................................................................... 24

*Mexia v. Rinker Boat Co.*,
   174 Cal. App. 4th 1297 (2009) ...................................................................................... 16

*Mullins v. Premier Nutrition Corp.*,
   No. 13-cv-01271-RS, 2016 U.S. Dist. LEXIS 51140 (N.D. Cal. Apr. 15, 2016)..................... 22

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) .......................................................................................... 16

*Pettit v. Procter & Gamble Co.*,
   No 15-CV-02150-RS, 2017 U.S. Dist. LEXIS 122668 (N.D. Cal. Aug. 3, 2017) ...................... 12

*Pulaski & Middleman, LLC v. Google, Inc.*,

802 F.3d 979 (9th Cir. 2015) ..........................................................................................23

*Ries v. Ariz. Bevs. USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2012) .............................................................................14

*Salas v. Toyota Motor Sales, United States, Inc.*,
   No. CV 15-8629 FMO (Ex), 2019 U.S. Dist. LEXIS 77847 (C.D. Cal. Mar. 27, 2019) .............16, 19

*Sloan v. Gen. Motors LLC*,
   287 F. Supp. 3d 840 (N.D. Cal. 2018) .......................................................................18

*Sonneveldt v. Mazda Motor of Am., Inc.*,
   No. 8:19-cv-01298-JLS-KES, 2022 U.S. Dist. LEXIS 219297 (C.D. Cal. Oct. 21, 2022) ............24

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ...................................................................................15

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ...................................................................16, 19, 21

*Tait v. BSH Home Appliances Corp.*,
   289 F.R.D. 466 (C.D. Cal. 2012) ..........................................................16, 17, 21

*Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. 2016) ..................................................................................16

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ..................................................................................16, 18

*Victorino v. FCA US LLC*,
   No.: 16cv1617-GPC(JLB), 2019 WL 5268670 (S.D. Cal. Oct. 17, 2019) ..........................14

*Victorino v. FCA US Ltd. Liab. Co.*,
   326 F.R.D. 282 (S.D. Cal. 2018) ..............................................................................14

*Vizcarra v. Unilever United States Inc.*,
   No. 4:20-cv-02777 YGR, 2023 U.S. Dist. LEXIS 38208 (N.D. Cal. Feb. 24, 2023).................12

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .................................................................12, 13, 18, 24

*Werdebaugh v. Blue Diamond Growers*,
   No. 12-CV-2724-LHK, 2014 U.S. Dist. LEXIS 71575 (N.D. Cal. May 23, 2014) ..................14

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) ...................................................13, 16, 17

*Zakaria v. Gerber Prods. Co.*,
   No. LA CV15-00200 JAK (Ex), 2016 U.S. Dist. LEXIS 184861 (C.D. Cal. Mar. 23, 2016) .........16

**Statutes**

Cal. Bus. & Prof. Code § 17200 .......................................................................... i, 19

Cal. Bus. & Prof. Code § 17500 ............................................................................... i

Cal. Civ. Code § 1770(a) ..................................................................................19

Cal. Com. Code § 2314 ...................................................................................... i

Cal. Com. Code § 2314(1) ..................................................................................16

Cal. Com. Code § 2314(2)(c) ..............................................................................16

**Rules**

Fed. R. Civ. P. 23 ........................................................................................ i, ii

Fed. R. Civ. P. 23(a) ....................................................................................12

Fed. R. Civ. P. 23(a)(1)..................................................................................................12

Fed. R. Civ. P. 23(a)(4)..................................................................................................14

Fed. R. Civ. P. 23(b)......................................................................................................12

Fed. R. Civ. P. 23(b)(2)..................................................................................................24

Fed. R. Civ. P. 23(b)(3)..................................................................................12, 15, 16, 25

PLANTIFFS' MOTION FOR CLASS CERTIFICATION - CASE NO. 3:22-CV-07463-TLT

## I.    INTRODUCTION

Nearly two decades ago, Defendant Crocs, Inc. ("Crocs") launched its now ubiquitous Classic Clog made from a proprietary foam compound called Croslite. Crocs built upon the success of the Classic Clog by developing other shoe styles also made of Croslite. Crocs knew the obvious: its consumers buy these shoes to wear them. But it hid that Croslite shoes suffer a design defect: they will shrink a full size in hot environments, including direct sunlight, rendering them unwearable.

Croslite's inherent shrinkage is not up for debate. It is a foam polymer, and, like any foam polymer, it will "relax" in hot temperatures, resulting in what Crocs terms a "████████████████████. Ex. 17.[4]
████████████████████████████████████████████
████████████████████████████████████████████
███████. Ex. 1. ████████████████████████ *Id.* ████
████████████████████████████████████████████
████████████████████, *see* Exs. 2, 3, 4, ██████████
████████████. Ex. 5 at 50:3–12. ███████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████ Ex. 3. ██████████
████████████████████████████████████. *Id.* ████████
████████████████████████████████████ Ex. 6; Ex. 48. ███

Despite this knowledge, Crocs made no effort to alert consumers to the defect prior to purchase. It, instead, opted to bury half-hearted disclosures in places it knew consumers would not see until ***after purchase, if at all***, such as on in-store ***receipts*** and a Crocs webpage with cleaning instructions. Ex. 7. Unsurprisingly, in a consumer perception survey, the vast majority of participants (approximately 82%) had no idea that the shoes could shrink a whole size in hot environments, including direct sunlight. Dennis Decl. ¶87. Crocs has benefited tremendously from concealing this fundamental defect: it helped Crocs rack up well over $██████████ in sales of the Classic Clog nationwide from 2018 to 2023 alone. Ex. 8.

---

[4] Unless otherwise noted, citations to "Ex. __" refer to exhibits to the Backer Decl. filed herewith.

Plaintiffs Ruby Cornejo and Tiffany Avino are California consumers who bought Crocs shoes that shrank a size or more shortly after purchase. Ex. 9 at 48:11–49:12; Ex. 10 at 81:25–82:16. They seek to certify for class treatment their claims for breach of implied warranty of merchantability and violation of the CLRA, the fraud prong of the UCL, the FAL, and common law. Each claim is imminently certifiable. The central issue for the warranty claim is whether the Products[5] suffer from a latent defect rendering them unfit for their ordinary use. The existence and nature of that defect is a common question since all Products are made from the exact same material: 100% Croslite. Whether Croslite can cause the shoes to materially shrink when exposed to typical hot environments will be the same for all class members. The central issues in Plaintiffs' deception by omission claims are whether Crocs had a duty to disclose the shrinkage defect, and whether its omission was likely to deceive reasonable consumers. These questions are, again, both common. The first turns on the representations about shoe size that Crocs made on *every single class Product* and Crocs' knowledge of the defect, while the second is based on an *objective* standard that is necessarily common for everyone. Moreover, damages on all claims are subject to common proof since all consumers sustained the same injury at the time of purchase when they overpaid for products with an undisclosed, latent defect. Because these common issues predominate over any individualized issues, class certification should be granted.

## II.   STATEMENT OF FACTS

### A.   The Products.

Crocs launched in 2002 with a model of shoes that would become its now famous Classic Clog. Ex. 5 at 18:21–19:12. The Classic Clog became "the heart of [] Crocs Brand's DNA," so it went on to develop other varieties of clogs—including kids and toddler versions of the Classic Clog and Baya, Tie Dye and Bayaband clogs. *Id.*; *see also* Ex. 11 at 2; Ex. 12 at 31. As Crocs has acknowledged, ██████ ███████████████████████████████████████████████ Ex. 13, at 3. To that end, Crocs has consistently marketed its clogs for beach and pool environments since they were introduced. Ex. 14 at 116:9–20, 118:12–20; *see also* Ex. 15 at CROCS-01465, -01469, -01486, -01499, -01524.

---

[5] The "Products" are all sizes and colors sold during the class period of the following Crocs shoes: Classic Clog; Classic Clog (kids); Classic Clog (toddlers); Classic Tie Dye Clog; Bayaband Clog; and Baya Clog.

**B.    The Defect.**

All of the Products have been made out of 100% Croslite for the entirety of the class period. Ex. 32; Ex. 16. But Crocs has long known that the Products have a major design defect: Croslite shrinks in hot environments which can cause the shoes to drop a whole size (or more) and become unwearable. Ex. 5 at 258:5–22; Hickner Decl. ¶71. Croslite ███████████████████████████████. Hickner Decl. ¶16; Ex. 5 at 47:24–48:7. Accordingly, it is ██████████████████████████████ ███████████████████████████ Ex. 2 (emphasis added).

Croslite shrinks on exposure to heat ██████████████████████. Hickner Decl. ¶¶55-56. Polymer relaxation is a well-known phenomenon that occurs in all polymeric materials. *Id*. ¶54. Fundamentally, relaxation is the process in which polymers disentangle due to molecular motions, allowing them to move in relation to one another. *Id*. The process of injection molding "stretches out" polymer chains, a configuration that is disfavored under the laws of thermodynamics. *Id*. ¶¶51-52. With heat, the polymer relaxes, allowing it to adopt a more favorable coiled state that is effectively shorter. *Id*. This process is influenced by temperature and time; it occurs more rapidly at higher temperatures. *Id*. ¶¶52-54. Further, ████████████████████████████████████████ Ex. 17. When it thereafter cools, ████████████████████████████████████ as Crocs put it. *Id*. ████████████████████████████.

The Products are defectively designed because they undergo polymer relaxation in ordinary hot environments, including direct sunlight, which can cause them to shrink a full size. Hickner Decl. ¶71. The fact that the ████████████████████ exacerbates polymer relaxation and shrinkage. *Id*. ¶56. ████████████████████████████████████████████ ███████. Ex. 5 at 50:3–12.

**C.    Crocs Knew of the Common Shrinkage Defect** ████████████.

████████████████████████████████████████████████
████████████████████████████████████████████████
██ *See* Ex. 1. ███████████████████████████████████
████████████████████████████ Ex. 5 at 99:13–15. █████████

1      █████████████████████████████████████. *Id*. at 100:16–

2      112:4.

3      █████████████████████████████. *Id*. at 113:9–14. ████████

4      ███████████████████████████████. *Id*. at 111:5–113:14; *see also*

5      *id*. at 251:13–15 ████████

6      ███████ Ex. 1 at 11. ██████████████████ Ex. 5

7      at 112:2–4 ███████████████████████████████████████

8      ██████████████████████████████████████████████

9      ██████████████████████)[6]

10       The temperatures used for the ████████████████████████

11      █████████████████████████. For example, ██████████████

12      ███████████████████████████ Ex. 1 at 11; *see also* Ex. 3 ████

13      █████████████████████████████████████; Ex. 18 (same

14      from 2022). It is well-known that enclosed spaces, such as vehicles, can get much hotter than the

15      surrounding ambient air. Hickner Decl. ¶¶60, 62. Even at an ordinary air temperatures like 94º F (34º C),

16      the "[t]emperature[] inside a closed vehicle can reach over 140 degrees [F (60 ºC)] within minutes" and

17      dark seats can "easily" reach 180–200º F (82-93º C). *Id*. Indeed, cities throughout California typically

18      experience heat waves with temperatures above 100º F (37º C). *Id*. ¶59. Similarly, surfaces, such as

19      concrete, are known to quickly absorb heat and can reach temperatures well-above the ambient air, up to

20      170º F (76 º C).[7] *Id*. ¶61. One study demonstrated that surface temperatures for substances such as concrete

21      that were 30–50º F (17–27º C) higher than the ambient temperature. *Id*. ¶62. A Product, however, does not

22      have be subjected to 70º C to shrink: ███████████████████. Ex. 5 at 112:2–4 (█

23      ██████████), 211:16–212:7 (██████████████████). Thus, leaving the Products out on

24      such a surface, or in an enclosed space such a car, trunk or bag, ██████████████

25      ████████████████████.

26      █████████████████████████████████

27

28      [6] For reference, 80° C is 176° F; 75° C is 167° F, and 55° C is 131° F.
        [7] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10211493/#:~:text=In%20direct%20sunlight%2C%20t
hey%20measured,147.2%F)%20for%20cement.

1  ████████████████████████████████████████████

2  ██████████████ Ex. 1 at 8. ██████████████████

3  ██████████████ Ex. 5 at 108:18–109:19. ████████. *Id.* As Crocs'

4  30(b)(6) designee testified, ████████████████████

5  ████████████████████████████. *Id.* at 243:13–246:1. ████████

6  ████████████████████████

7      Third, Crocs learned that, ████████████████████."[8] Ex. 3.

8  ██████████████████████████ *Id*; *see also* Ex. 1

9  ██████; Ex. 5 at 121:13–18. The finding is critical for the clogs because, as Crocs saw,

10  ████████████████████████████ as a result. Ex. 3;

11  Ex. 5 at 32:17–25. This is because ████████████████████

12  ████████████████████ Ex. 5 at 125:15–18, 162:16–20.

13  ████████████████████████████████████████

14  ████████████████████ Ex. 4. ████████████

15  ████████████████████████ *d.*

16  ████████████████████████

17  ████████████████████████████ Ex. 5 at 141:20–142:5; *see also*

18  Ex. 3. ████████████████████████. *Id.* at 150:17–

19  151:12. ████████████████████████

20  ████████████████████ *Id.* ████████

21  ████████████████████████████████████

22  ██████████████, *Id.* at 162:24–164:13; Ex. 3 at CROCS-02510.

23  ████████████████████████ *Id.* at 163:18–164:16.

24  ██████████████. Ex. 4; *see also* Ex. 5 at 196:19–22.

25  ████████████████████████████████████

26  ████████████████████ *Id.*; *see also* Ex. 3; Ex. 2

27  ████████████████████████████████████

28

[8] ████████████████████████. Ex. 5 at 47:9–12.



Ex. 5 at 211:16–212:7.

*Id*. at 95:4–96:8. However, as Crocs well knew,

. *Id*. at 93:7–15, 107:5–8, 217:17–19, 224:7–225:8, 258:5–8.

*Id*. at 217:4–218:24; *see also* Ex. 18. *Id*.

**D.**   **Crocs' Efforts to Address Shrinkage Have Been Ineffective.**

**1.**

. Ex. 5 at 224:7–17, 91:5–7; *see also* Ex. 19. Although

the defect remains. *Id*. at 229:25–230:3, 235:19–236:10.

. *Id*. at 253:8–13.

The test that Crocs eventually designed

. Ex. 20; *see also* Ex. 5 at 156:19–157:7, 239:7–24; Ex. 13.

Ex. 13 at 5; Ex. 5 at 239:16–241:7. But

Ex. 13 at 5; Ex. 5 at 241:8–242:20. It also designed the test such that shoes that



1    ███████. Ex. 20; Ex. 5 at 250:2–251:15. ██████████████████████

2    █████████████████████████ Ex. 5 at 251:13–15, 258:5–22 ████████████

3    ███████████████████████████████████████████████████████████ And

4    ███████████████████████████████████ *See* Hickner Decl. ¶66.

5              **2.     Crocs Chose Not to** █████████████████████████.

6        ██████████████████████████████████████████████████████████

7    ████████████████████████████████████. Ex. 21 at 7–9, Ex. 16, Hickner Decl. ¶56.

8    ██████████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████████

10   ████████████. Ex. 1 (██████████████████████████████████████████); *see*

11   *also* Ex. 3 (███████████████████████████); Ex. 4 (████████████████████████

12   ██████████████████████████████████████████████████████████████

13   ████████████████████████y. *Id.* ██████████████████████████████████

14   █████████████████████████████████ Ex. 5 at 181:12–182:17, 188:13–189:23. ████

15   ██████████████████████████████████████████████ *id.* at 177:17–

16   20; *see also* Ex. 3, and ████████████████████████████████████████████

17   ████████████ Ex. 3 at CROCS-02511. █████████████████████████████████

18   ████████. *Id.*; *see also* Ex. 5 at 195:23–196:3. ██████████████████████

19   ██████████████████████████████. *Id.* at CROCS-02517; *see also* Ex. 5 at 178:7–11; 183:9–13.

20        ██████████████████████████████████████████████████████████

21   ███████████████████████████████████████████.[9] Ex. 3; Ex. 5 at 189:19–23,

22   186:12–187:2. ███████████████████████████████████████████████████

23   ████████████. Ex. 5 at 190:20–191:19. ██████████████████████████████

24   ██████████████████████████████████████████████████████████████

25   ███████████████████████████████████████████. Ex. 5 at 188:20–189:14, 192:2–

26   ██████████████████████████████████████████████████████████████

27

28   _____
     [9] As is pertinent to this motion, the "Classic" style family includes the Classic Clog, Classic Tie Dye Clog,
     Classic Clog (T), Classic Clog (K). Ex. 16; *see also* Ex. 5 at 25:17–26:16.

11, 193:1–194:7. █████████████████████████████████████████████████

████████████████████████████████████████████████████.

### E.    Crocs Failed to Warn Consumers About the Risk of Shrinkage.

Each Product was sold with hangtags that represented, among other things, the size of the shoe for the entirety of the class period. Ex. 22; Ex. 23. All Product webpages on the Crocs website included a shoe size as well. *Id*. But Crocs never warned on any label or Product webpage that the shoes may lose their represented size in direct sunlight and hot environments. *Id*.; *see also* Ex. 14 at 24:13–25:1.

The limited disclosures Crocs did make plainly acknowledge the fact that the shoes can shrink but omitted that the Products could shrink a whole size in ordinary hot environments. Ex. 7. Crocs also did not bother to put these disclosures in places where consumers would see them *prior to purchase*. For instance, throughout the class period, Crocs stated "Keep your Crocs away from extreme heat" in fine print on its in-store receipts—a place consumers would see only *after* they bought the Products (if at all). Ex. 7 at 6; *see also* Ex. 24; Ex. 24; Ex. 14 at 21:4–17. ████████████████████████████████████

████████████████ *see* Ex. 25 at 51:22–52:1, Crocs never requested, let alone considered, asking retailers to include disclosures on their receipts. Ex. 14 at 22:6–23:3. Crocs also buried deep within the Crocs website, on the "Caring for your Crocs" webpage, a statement that reads: "Exposure to extreme heat, sun, dishwashers, washing machines, or hot cars can cause the shoes to shrink or warp."[10] Ex. 7 at 6; *see also* Ex. 26; Ex. 14 at 45:2–48:25.[11] It is hard to imagine that consumers would locate the "Caring for Your Crocs" page, much less read the cleaning instructions *prior to purchase*.

Yet, Crocs knew it should be warning consumers. ██████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Ex. 27. But that was not true. Crocs never made an effort to ensure consumers were aware of this information prior to purchase,

---

[10] To see this warning, a consumer would need to scroll to the bottom of the Crocs webpage and click the "Caring for your Crocs" or FAQs link, which are listed at the bottom of a series of links under the Help header. Backer Decl. ¶¶28-30. Under the heading "How to Clean Your Crocs," there are a series of headers with a final subheading "Air Dry." *Id*. Crocs makes the disclosure in the final sentence. *Id*.; *see also* Ex. 26.

[11] Crocs' Vice President of Marketing for America, Smeeta Khetarpaul, also noted ███████████████

██████████████████████████████████████████. Ex. 14 at 39:6–43:6.



though it easily could have put it front and center where it knew all consumers would see it—on the hangtags that came with all Products. Ex. 14 at 8:2–4, 23:7–19, 62:24–63:2; *see also* Ex. 7. Or, ▮▮▮ ▮▮▮ keep consumers in the dark.

### F.      Crocs Received Thousands of Complaints.

Crocs raised the alarm on shrinkage internally in a 2014 ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ex. 28 at 68. Two years later, after ▮▮▮▮▮▮▮▮, Mr. Ferniani wrote "▮ ▮▮▮▮▮▮▮ Ex. 29. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Id.*; *see also* Ex. 30 ▮▮▮▮▮▮▮▮

▮▮▮▮). 

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ex. 6 (showing ▮▮ complaints). ▮▮▮. Ex. 31 at 88:17–19. ▮▮▮

▮▮▮▮. Ex. 3. ▮▮▮. Ex. 6 (▮▮▮▮▮▮▮▮▮▮

But these complaints are but the tip of the iceberg. ▮▮▮▮

▮▮▮▮. Ex. 31 at 55:24–56:2, 100:15–101:2, 105:8–13, 129:3–22. ▮▮▮▮

▮▮▮▮. *Id.* at 52:16–56:2. But, as is obvious, some consumers may experience a reduction in size without knowing the actual cause is due to the shrinking material. They may complain about small size or fit instead. ▮▮▮▮ ▮▮▮▮. Ex. 32. ▮▮▮

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮. Ex. 31 at 52:16–56:2, 100:15–101:2, 105:8–13. ▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 6. ▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ▮▮▮▮▮

5 ▮▮▮▮▮▮▮. And, most importantly, it still does not warn of the defect at purchase.

6 **G.    Crocs Knew That Fit Is the Top Reason Consumers Buy the Products.**

7 Crocs, of course, knows consumers ▮▮▮▮▮▮▮▮▮▮ Ex. 5 at 44:10–12.

8 Crocs also knew ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 33 at 17; *see also*

10 Ex. 14 at 110:5–23. Indeed, ▮▮▮▮▮▮▮▮▮▮

11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." *Id.*

12 ▮▮▮▮▮▮▮▮▮▮▮. Ex. 34 at 15 ▮▮▮

13 ▮▮▮▮▮); Ex. 35, at 61–63 ▮▮▮▮▮

14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 36, at 41

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

16 The surveys that ▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮. Ex. 37, at 23–24, 37–38; *see also* Ex. 38; Ex. 39. Indeed, ▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 14 at 68:14–72:14; *see*

20 *also* Ex. 12, at 10. To that end, ▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮ty. Ex. 40, at 7 ▮▮▮▮

22 ▮▮▮▮▮); Ex. 41 at CROCS-53714 (▮▮▮▮▮▮

23 ▮▮▮); Ex. 42 (▮▮▮▮▮▮▮▮▮▮▮▮

24 At the same time, Crocs knew that consumer awareness of the shrinkage defect would ▮▮

25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮. 14 at 130:6–24. Behind the scenes, it recognized that the ▮▮▮

27 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 43 at CROCS-53441. Rather than risk damaging sales

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - CASE NO. 3:22-CV-07463-TLT

by alerting consumers to the defect *before purchase*, Crocs hid information about shrinkage for fear consumers would not buy Products that can shrink to the point of becoming unwearable.

### H.   Crocs' Omission of the Defect Misled Consumers.

Plaintiffs' survey expert, Dr. J. Michael Dennis, is Senior Vice President of NORC, where he leads the online panel research business. Dennis Decl. ¶12. He has been responsible for hundreds of consumer surveys. *Id.* ¶6. Using methodologies well established in the published literature, he polled California consumers who have purchased clog, slide and sandal products in the last five years to determine how they understood Crocs' labeling and Classic Clog webpage. *Id.* ¶¶26–89. Only 18.1% of participants expected, based on the Crocs' advertising and labelling, that the shoes might shrink in hot environments. *Id.* ¶87. All other participants either affirmatively believed the shoes would keep their size in hot environments (65.8%) or did not know (16.1%), and, thus, the vast majority (approximately 82%) were deceived. *Id.* Plaintiffs were no different: they bought the Products without knowing they could shrink a full size (or more) in hot environments and their shoes shrank shortly after purchase. Ex. 9 at 48:11–51:25, 57:24–59:23, 132:5–20, 143:9–14, 145:19–148:12; Ex. 10 at 81:25–82:16, 85:25–86:2, 104:8–10, 105:19–106:11, 111:15–17, 117:8–14, 129:3–15; *see also* Ex. 41, Ex. 49. Had they known the truth, they would not have bought the Products or would have paid less. *Id.*

### I.   Crocs Charged a Price Premium Because It Sold Defective Shoes.

Plaintiffs' damages experts, Steve Gaskin and Colin Weir, propose a widely accepted methodology to measure and isolate the price premium that consumers paid as a direct result of the omitted shrinkage defect: conjoint analysis. Gaskin Decl. ¶¶11–24, 58; Weir Decl. ¶¶12–39. Conjoint analysis utilizes a survey where respondents are presented with various choices of product attributes, prices, and alternatives, and asked to select their preferred product, which allows researchers to then apply statistical methods, including regression analysis, to value those attributes in the market. *Id.* Mr. Gaskin designed a carefully controlled conjoint survey to measure the price premium solely attributable to the omitted shrinkage defect. *Id.* ¶¶25–52. Based on this analysis, which is described more fully below and in Mr. Gaskin's and Mr. Weir's declarations, they have proposed a reliable methodology to isolate the price premium attributable to the omitted shrinkage defect.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.   ARGUMENT

Rule 23 provides district courts with broad discretion to determine whether a class should be certified. *See Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001). Class actions are favored where, as here, there is alleged wrongdoing against a large number of persons, each of whom has suffered a small amount of damages. *See, e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998) (holding that class certification was appropriate because litigation costs would dwarf potential recovery by class members if forced to pursue actions individually).

A class action must satisfy all four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy, The class must also satisfy at least one subdivision of Rule 23(b). Here, each class satisfies Rule 23(b)(3) because "questions of law or fact common to members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

### A.   The Class Satisfies the Requirements of Rule 23(a).

#### 1.   The Class is Sufficiently Numerous.

Rule 23(a)(1) requires the class to be so numerous that joinder of all class members is "impracticable." Fed. R. Civ. P. 23(a)(1). Crocs sold thousands of each of the Products in California during the class period. *See* Ex. 25 at 33:20–37:24; Ex. 44; Ex. 8 (showing Crocs' sales and units sold of the Products in California during the Class Period). This is sufficient. *See, e.g., Vizcarra v. Unilever United States Inc.*, No. 4:20-cv-02777 YGR, 2023 U.S. Dist. LEXIS 38208, at *16–17 (N.D. Cal. Feb. 24, 2023) (numerosity satisfied where tens of thousands of units sold).

#### 2.   There Are Common Questions of Fact and Law.

"'Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury' and that the class's claims depend on 'a common contention . . . of such a nature that it is capable of classwide resolution.'" *Pettit v. Procter & Gamble Co.*, No 15-CV-02150-RS, 2017 U.S. Dist. LEXIS 122668, at *6 (N.D. Cal. Aug. 3, 2017) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Because commonality collapses into the predominance inquiry for purposes of certifying a class under Rule 23(b)(3), the common issues in this case are discussed together with the predominance of those common issues in Section III(B)(1) *infra*. In short, commonality is "easily" met here, as the claims of all Plaintiffs

and class members "involve the same alleged defect[.]" *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010).

### 3. Plaintiffs Are Typical of the Class.

"Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interest of the class representative aligns with the interests of the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017). "The requirement is permissive, such that representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Id*.

"Some degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality." *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1184 (9th Cir. 2007), *overruled on other grounds by Wal-Mart*, 564 U.S. 338. Typicality is satisfied if the named plaintiffs' claims and injuries stem from the same practice or course of conduct that forms the basis of the class's claims and are based upon the same legal theory. *Wolin*, 617 F.3d at 1175 (typicality satisfied where "Gable and Wolin allege that they, like all prospective class members, were injured by a defective alignment geometry in the vehicles [and the plaintiffs] and the class seeks to recover the pursuant to the same legal theories: violation of consumer protection laws, breach of warranty, and unjust enrichment.").

Here, Plaintiffs, like all members of the Class, bought shoes made entirely of Croslite during the class period that came with a defect that causes the shoes to shrink a full size in hot environments. Ex. 9 at 48:11–49:12, 87:7–14, 125:21–126:1; Ex. 10 at 52:14–17, 81:25–82:16; Hickner Decl. ¶71. Crocs did not disclose the shrinkage defect to Plaintiffs or the Class on the Product label prior to their purchase. Ex. 22; Ex. 23; Ex. 14 at 24:13–25:1. Plaintiffs, like all Class members, sustained economic injuries at the time of purchase in the form of the price premium they paid for defective products. Gaskin Decl. ¶¶57–58; Weir Decl. ¶¶37, 50, 67; *see also Huu Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 821 (9th Cir. 2019). Moreover, Plaintiff Avino is typical of all Subclass members because she bought her shoes directly from Crocs. *See* Ex. 45; Ex. 10 at 95:22–96:1.

Courts almost invariably find similar facts sufficient for typicality. *See, e.g., Wolin*, 617 F.3d at 1175 (finding typicality satisfied in an implied warranty case where plaintiffs allege the same defect and legal theories as class members and "despite [any] different factual circumstances surrounding the

---

manifestation of the defect"); *Kaupelis v. Harbor Freight Tools USA, Inc.*, No. SACV 19-1203 JVS (DFMx), 2020 U.S. Dist. LEXIS 186249, at *25 (C.D. Cal. 2020) (typicality for implied warranty and false advertising claims was satisfied since differences in use of the product were not "sufficiently inconsistent [such] that Kaupelis would not have claims 'reasonably co-extensive with those of absent class members'"); *Victorino v. FCA US Ltd. Liab. Co.*, 326 F.R.D. 282, 293 (S.D. Cal. 2018) (finding typicality in a claim for breach of implied warranty where plaintiff "as well as the proposed class members allege their Clutch Systems were defective when they purchased their vehicles"); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 502 (S.D. Cal. 2013) (finding typicality where the named-plaintiff "suffered the same type of economic injury and seeks the same type of damages as the putative class members").

It does not matter that Plaintiffs did not purchase every Product because the underlying facts and theory of liability with respect to each product is the same. The "'prevailing view in the Ninth Circuit' is that class action plaintiffs can bring claims for products they did not purchase 'as long as the products . . . are substantially similar.'" *Cordes v. Boulder Brands USA, Inc.*, No. CV 18-6534 PSG (JCx), 2019 WL1002513, at *2 (C.D. Cal. Jan. 30, 2019); *see also Victorino v. FCA US LLC*, No.: 16cv1617-GPC(JLB), 2019 WL 5268670, at *9–10 (S.D. Cal. Oct. 17, 2019). And, as this Court previously found, "any difference in 'configuration' of the footwear, whether a sandal or a mukluk, [is] a neutral consideration as it relates to the common injury that emphasizes a single shared ingredient": Croslite. ECF No. 31 at 9. The Products here are all substantially similar: all are clogs that are made entirely of Croslite and, thus, share the common defect. Hickner Decl. ¶¶51-55, 71; Ex. 32, Ex. 16; Ex. 28. *See In re Macbook Keyboard Litig.*, No. 5:18-cv-02813-EJD, 2021 U.S. Dist. LEXIS 65812, at *30 (N.D. Cal. Mar. 8, 2021) (finding substantial similarity because "[a]lthough certain design elements of the Butterfly Keyboard in the 2019 model may differ from the other Butterfly Keyboard models represented, the aspects of the keyboard that Plaintiffs allege are defective—i.e. the low travel and narrow key gaps—are the same across all models"); *see also Werdebaugh v. Blue Diamond Growers*, No. 12-CV-2724-LHK, 2014 U.S. Dist. LEXIS 71575, at *56 (N.D. Cal. May 23, 2014); *Astiana*, 291 F.R.D. at 502–03; *Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 538–39 (N.D. Cal. 2012); *Chavez v. Blue Sky Nat. Bev. Co.*, 268 F.R.D. 365, 377–78 (N.D. Cal. 2010).

### 4.     Plaintiffs and Counsel Will Adequately Represent the Class.

Fed. R. Civ. P. 23(a)(4) requires that the class representative and class counsel "fairly and

adequately protect the interests of the class." In the Ninth Circuit, this is satisfied if (1) neither the representative plaintiffs nor their counsel "have any conflicts of interest with other class members," and (2) the representative plaintiffs and their counsel will "prosecute the action vigorously on behalf of the class." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Plaintiffs will fairly and adequately protect the interests of the members of the Class because it is in their best interest to prosecute the clams alleged in the First Amended Complaint to obtain full compensation due to all Class members for the misconduct of which they complain. Plaintiffs have no conflicts with the Class, let alone an irreconcilable conflict, with other Class members. Rather, they stand in the same shoes as all other members of the Class, seek the same relief as other Class members, and have a common interest in obtaining all of the relief sought. Both Plaintiffs have testified that they understand they have a duty to other consumers, and have stressed how important they believe it is to force Crocs to fix the shrinkage problem or, at a minimum, provide notice of it to consumers before purchase. Ex. 9 at 32:22–33:17, 144:16–145:5, 148:7–12, 173:25–174:8; Ex. 10 at 41:19–42:3, 84:9–18, 122:18–123:1. 129:3–15, 131:2–13.

Plaintiffs' counsel will also adequately protect the interests of the class. Counsel have successfully represented numerous plaintiff classes, involving a variety of claims, in state and federal courts throughout the country. Safier Decl. ¶ 4 & Ex. A at 1–3. Gutride Safier LLP has been involved (and appointed class counsel) in over twenty-eight class actions; it has also obtained many multiple key Ninth Circuit precedents applicable in consumer cases. *Id*. Plaintiffs' counsel has the necessary financial resources to vigorously litigate this action. Safier Decl. ¶ 6. The firm does not have any conflicts of interest with members of the class. *See id*. This is more than sufficient to establish adequacy. *See, e.g., Astiana*, 291 F.R.D. at 503 (finding adequacy where "the interim co-lead counsel has experience in prosecuting consumer fraud and warranty class actions"); *McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB (OPx), 2014 U.S. Dist. LEXIS 8443, at *37 (C.D. Cal. Jan. 13, 2014) (finding adequacy where class counsel was "an experienced class action firm that has participated in many cases similar to the present action").

### B.     The Class Satisfies the Requirements of Rule 23(b)(3).

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class is superior to other available methods for

fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The question is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011) (cleaned up). In evaluating predominance, "more important questions apt to drive the resolution of the litigation" carry greater weight than less significant individualized questions. *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). So, "even if just one common question predominates, 'the action may be considered under Rule 23(b)(3) even though other important matters will have to be tried separately.'" *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (en banc) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016)).

"In order for the plaintiffs to carry their burden of proving that a common question predominates, they must show that the common question relates to a central issue in the plaintiffs' claim." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). Accordingly, "considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Id*. (quotations and citation omitted).

### 1.    Common Questions Predominate Under the Class's Implied Warranty Claim.

An implied warranty is breached when goods are not fit for their ordinary purpose. Cal. Com. Code § 2314(1), (2)(c). Here, Plaintiffs' implied warranty claims turn on whether the Products were merchantable. *Id*. "In the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery." *Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1304–05 (2009). And "proof of the manifestation of a defect is not a prerequisite to class certification." *Wolin*, 617 F.3d at 1173.

Courts "routinely certify implied warranty classes" "[b]ecause an implied warranty claim requires an objective standard" of proof. *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 485 (C.D. Cal. 2012); *see also Salas v. Toyota Motor Sales, United States, Inc.*, No. CV 15-8629 FMO (Ex), 2019 U.S. Dist. LEXIS 77847, at *30–31 (C.D. Cal. Mar. 27, 2019) ("An implied warranty claim requires an objective standard, and is 'therefore susceptible of common proof'"); *Zakaria v. Gerber Prods. Co.*, No. LA CV15-00200 JAK (Ex), 2016 U.S. Dist. LEXIS 184861, at *38–39 (C.D. Cal. Mar. 23, 2016) (same).

The implied warranty claim asserted here "is grounded in a defective design common to all [the Products]" because each Product is made entirely from the same material with the same inherent tendency

1  to shrink—Croslite. Hickner Decl. ¶¶51-55, 71; Ex. 2; Ex. 5 at 50:3–12. Therefore, "the breach of implied

2  warranty claim is susceptible of common proof." *Tait*, 289 F.R.D. at 485. Either the Products are fit for

3  ordinary use or not. Crocs knew that ███████████████████████████████. Ex. 5 at 44:10–

4  12. The defect renders them unfit for this purpose because they can shrink over one size—in ordinary

5  conditions—rendering them unwearable. Ex. 5 at 217:4–218:24, 258:5–8; Ex. 2; Hickner Decl. ¶71.

6  Indeed, ██████████████████████████████████████████████████████████

7  ████████████████████████████. Ex. 2; Ex. 29. As such, "whether the alleged defect

8  existed and caused the product to be unfit . . . would be identical across all class members and subject to

9  common proof." *In re Sony Vaio Comput. Notebook Trackpad Litig.*, No. AJB 09cv2109 AJB (MDD),

10  2013 U.S. Dist. LEXIS 194010, at *48 (S.D. Cal. Sep. 25, 2013). The technical issues associated with

11  whether the Products contained the shrinkage defect, as well as whether the shrinkage defect could have

12  been mitigated or avoided, are also subject to common proof, since ████████████████████

13  ███████████████, and the properties of those materials, including their susceptibility to shrinkage

14  at various temperatures, are uniform. *See* Hickner Decl., ¶¶51-55, 71.

15       Crocs previously stated its intent to challenge class certification on the ground that the "vast

16  majority" of class members did not experience shrinkage based on the purportedly low volume of

17  complaints that specifically use a variation of the word "shrink." *See* ECF 14 at 17–20. But the Ninth

18  Circuit has consistently rejected this exact argument, holding "that, in design defect cases, 'proof of the

19  manifestation of a defect is not a prerequisite to class certification.'" *Wolin*, 617 F.3d at 1173; *see also Huu

20  Nguyen*, 932 F.3d at 822 (reversing denial of class certification for failing to account for the rate of

21  manifestation of the defect in the damages model). Indeed, Crocs' position completely misunderstands

22  Plaintiffs' theory. Like in *Huu Nguyen*, Plaintiffs do not seek damages for the faulty performance of the

23  shoes; rather, the sale of "the allegedly defective [shoe] is itself the injury, regardless of whether [Croslite]

24  caused performance issues." *Huu Nguyen*, 932 F.3d at 820. Thus, when or if any Class member actually

25  experienced shrinkage (and then complained directly *to Crocs*) is irrelevant to predominance. *Id.* at 822.

26  All Class members sustained injuries at the same time—the point of sale—because they paid more for

27  products with a concealed defect. *Id.*

28       Crocs may also argue that privity prevents certifying the implied warranty claims. But that is not

so. Generally, "a plaintiff must be in privity with a defendant in order to assert an implied warranty claim" absent an exception. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1184 (C.D. Cal. 2010). Notably, at this juncture, the Court need not determine whether privity exists or any exception applies as "that is a merits question" inappropriate for resolution at class certification. *Just Film, Inc.*, 847 F.3d at 1122. Instead, the only question here is whether the privity requirement or any exceptions present "common question[s]" "where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc.*, 577 U.S. at 453. That is undoubtedly the case here.

First, all members of the Subclass purchased their Products directly from Crocs, allowing privity to be resolved "in one stroke" for them all. *Wal-Mart*, 564 U.S. at 350. As for non-direct purchasers, this Court and the Ninth Circuit have recognized "[s]ome particularized exceptions to the [privity] rule." ECF No. 30 at 8. One is "when the plaintiff relies on written labels or advertisements of a manufacturer." *Id.* For this exception, in the omission context, the "proper focus" "is on whether the Defendant could have disclosed the information to Plaintiffs through the exercise of reasonable care, and whether Plaintiffs would have received it had Defendant done so." *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 874 (N.D. Cal. 2018). Plaintiffs, like all Class members, were exposed to the Product hangtags where Crocs easily could have disclosed the defect but failed to do so. Ex. 22; Ex. 23; Ex. 14 at 24:13–25:1. Thus, the application of the reliance exception to privity is suitable for determination for the Class as a whole.

The other exception—for third-party beneficiaries—can also be determined on a class-wide basis. As the Court previously recognized, "some courts" find that "product end users may be implied third party beneficiaries of distribution contracts between the manufacturer and retailer." ECF No. 30 at 8. Crocs here had a Limited Warranty that ███████████████████████████████████████████ ███████████████████████████████, and, thus, the Court can determine from this common evidence whether or not Crocs intended for all consumers to be the beneficiary of that warranty. Ex. 31 at 17:4–18:7; Ex. 26; Ex. 47; Ex. 26 at CROCS-01859; *see also In re Toyota Motor Corp.*, 754 F. Supp. 2d at 1145 (finding third-party beneficiary exception applied since the warranty was intended for purchasers and not dealerships).

### 2. Common Questions Predominate Under the CLRA, UCL Fraud Prong, and Common Law.

The UCL prohibits "unfair competition," broadly defined as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The CLRA prohibits particular "unfair methods of competition and unfair or deceptive acts or practices" in transactions for the sale or lease of goods to consumers. Cal. Civ. Code § 1770(a). Fraudulent omissions are actionable under both the CLRA and the UCL. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) ("Fraudulent omissions are actionable under both [the CLRA and UCL]."); *Collins v. eMachines, Inc.*, 202 Cal.App.4th 249, 255–56 (2011) (identifying four circumstances under which a duty to disclose arises in omission cases).

"The UCL focuses on the perpetrator's behavior: 'to state a claim under . . . the UCL . . . it is necessary only to show that members of the public are likely to be deceived.'" *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (quoting *In re Tobacco II Cases*, 46 Cal.4th 298, 312 (2009)). "Analysis under [the] CLRA is similar. To establish a CLRA claim, the plaintiff must show: (1) the defendant's conduct was deceptive; and (2) the deception caused plaintiff to be harmed." *Salas*, 2019 U.S. Dist. LEXIS 77847, at *20 (citing *Stearns*, 655 F.3d at 1022). Common issues predominate in omission cases under the CLRA and UCL because "the central issues . . . turn on [Crocs'] uniform conduct and the questions key to Plaintiff's claims will be answered by reference to the same set of facts." *Alger v. FCA US LLC.*, 334 F.R.D. 415, 425 (E.D. Cal. Feb. 18, 2020); *see Chamberlain v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005) (predominant issues were "whether [the defendant] was aware of alleged . . . defect"; "whether [the defendant] had a duty to disclose its knowledge"; "whether it failed to do so"; "whether the facts that [the defendant] allegedly failed to disclose were material"; and "whether the alleged failure to disclose violated the CLRA.").

### a. Common Questions Predominate as to the Existence of the Defect.

The existence of the defect is subject to common proof. *Salas*, 2019 U.S. Dist. LEXIS 77847, at *13 (finding common questions for UCL and CLRA claims appropriate for class treatment including "whether a defect exists in the Toyota Camry XV 50, whether Toyota knew about it, whether Toyota concealed the defect, whether Toyota violated consumer protection statutes as a result."). The Ninth Circuit recognizes that, at class certification, "the plaintiff need not prove the existence of the defect." *Edwards v. Ford Motor Co.*, 603 F. App'x 538, 540 (9th Cir. 2015). "[T]hat is a merits question not appropriately

19

1    addressed at the class certification stage." *Just Film, Inc.*, 847 F.3d at 1122. The burden, rather, is only "to

2    establish that the existence of the defects is subject to common proof, and that such common questions

3    predominate over individual questions." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 361

4    (N.D. Cal. 2018). Plaintiffs easily meet that burden. As explained above, all Products are made exclusively

5    of Croslite, and Croslite inherently manifests the same shrinkage defect in all Products. Ex. 5 at 50:3–12,

6    217:4–218:24, 258:5–8; Hickner ¶¶ 51-55, 71; Ex. 32; Ex. 16. Whether the shrinkage defect exists is, thus,

7    a common question that may be established with common proof as to the Class. *See Amgen Inc. v. Conn.*

8    *Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013); *see also In re Arris Cable Modem Consumer Litig.*, 327

9    F.R.D. at 361. Crocs' knowledge of the defect similarly turns on the information that Crocs possessed and

10   is entirely common to the Class since the fact finder "can determine what defendant knew about the alleged

11   defect, when it knew what, and at what point that knowledge was no longer exclusive once for all class

12   members." *Daniel v. Ford Motor Co.*, No. 2:11-02890 WBS EFB, 2016 U.S. Dist. LEXIS 130745, at *20

13   (E.D. Cal. Sep. 23, 2016).

14                   **b.    Common Questions Predominate as to the Duty to Disclose.**

15          "The core question" for a failure to disclose a product defect is "'whether [the defendant] had a

16   duty to disclose the existence of the alleged defect.'" *Johnson v. Nissan N. Am., Inc.*, No. 3:17-cv-00517-

17   WHO, 2022 U.S. Dist. LEXIS 131657, at *61 (N.D. Cal. July 21, 2022). Here, common evidence will

18   establish that Crocs had a duty to disclose. One way a duty to disclose arises is by making "partial

19   representations" about an issue without stating other "material facts" pertaining to that issue. *Collins*, 202

20   Cal. App. 4th at 255–56. Another way the duty can arise is where the "defendant had exclusive knowledge

21   of material facts not known to the plaintiff." *Id.* Here, both of those issues can be assessed via common

22   proof. First, the labeling and point-of-sale webpages of the Products are common evidence that Crocs made

23   "partial representations" about the Products' sizes but "suppresse[d] some material fact," i.e., that the

24   Products will not retain their represented size in hot environments. *See Falk v. GMC*, 496 F. Supp. 2d 1088,

25   1095 (N.D. Cal. 2007). Indeed, every shoe sold represented that it had a particular size on its hangtags, the

26   bottom of the Product itself, and Product webpages at sale, but Crocs never disclosed the shrinkage defect

27   on any of these mediums. Ex. 22, Ex. 23, Ex. 14 at 21:4–25:1, Ex. 7 at 6. Rather, when Crocs did bother to

28   disclose that the shoes can shrink in heat, it intentionally did so only *after* purchase or buried deep within

its website, and it *never* disclosed that the shoes could shrink a whole size or more. *Id*.; *see also* Ex. 7; Ex. 26; Backer Decl. ¶29. Second, whether Crocs had exclusive knowledge of the shrinkage issue is necessarily common because it focuses solely on the Defendant, rather than any individual class members. *Edwards*, 603 F. App'x at 540 (finding that "whether a defect existed and whether Ford had a duty to disclose the defect were both questions common to the class"); *Alger v. FCA US LLC*, 334 F.R.D. 415, 423 (E.D. Cal. 2020) (same, citing *Edwards*).

### c.    Common Question Predominate on Consumer Deception.

Whether the omission of the defect was likely to deceive, "will be determined using the objective reasonable consumer test—an analysis that is particularly well-suited to class treatment." *Johnson*, 2022 U.S. Dist. LEXIS 131657, at *61. This test simply asks "whether 'members of the public are likely to be deceived'"; it does not require proof of "their individual reliance on the allegedly misleading statements." *Bradach v. Pharmavite, LLC*, 735 F. App'x 251, 2018 U.S. App. LEXIS 12820, at *2 (9th Cir. May 17, 2018) (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002)). "For this reason, courts have explained that CLRA and UCL claims are 'ideal for class certification because they will not require the court to investigate class members' individual interaction with the product.'" *Id*. (quoting *Tait*, 289 F.R.D. at 480).

Here, Plaintiffs will establish through common evidence, in the form of Dr. Dennis's consumer perception survey that reasonable consumers were deceived. Unsurprisingly, the majority of participants in Dr. Dennis' consumer perception survey were deceived: only 18.1% expected the shoes to shrink a full size in hot environments based on the Product labeling and Product webpage. Dennis Decl. ¶87. The vast majority (roughly 82%) did not expect the shoes to shrink or did not know and, thus, serves as classwide evidence that the omission was likely to deceive reasonable consumers. *Id*.

### d.    Common Questions Predominate as to Materiality and Reliance.

The common questions of materiality on the CLRA and fraud claims also predominates (materiality is not an element of the UCL or FAL claims). As with deception, "[q]uestions of materiality and reliance are determined based upon the reasonable consumer standard, not the subjective understandings of individual plaintiffs." *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411- YGR, 2016 U.S. Dist. LEXIS 92374, at *21 (N.D. Cal. July 15, 2016); *see also Stearns*, 655 F.3d at 1022. Because materiality is an objective standard common to all, and class wide reliance is inferred if the

misrepresentations or omissions were material, this question predominates. *Cf. Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115–16 (N.D. Cal. 2018) ("because deception and materiality are objective questions, they are common questions."); *see also Daniel*, 806 F.3d at 1225 (reliance can be inferred when an omission is material, and whether an omission is material is determined using a "reasonable consumer" standard.).

Plaintiffs will establish materiality though class wide evidence in the form of Croc's own documents and the conjoint survey. *See* Weir Decl. ¶46. █████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████ which proves both that fit was material and that Crocs knew it was. Ex. 33, Ex. 34, Ex. 35, Ex. 36, Ex. 37. █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████. Ex. 41; Ex. 42; s*ee, e.g., Kumar*, 2016 U.S. Dist. LEXIS 92374, at *23 ("Materiality can be shown by a third party's, or defendant's own, market research showing the importance of such representations to purchasers"); *Dei Rossi v. Whirlpool Corp.*, No. 2:12-CV-00125-TLN, 2015 WL 1932484, at *7 (E.D. Cal. Apr. 28, 2015) (materiality could be shown by reference to the defendant's documents and statements); *Mullins v. Premier Nutrition Corp.*, No. 13-cv-01271-RS, 2016 U.S. Dist. LEXIS 51140, at *16–17 (N.D. Cal. Apr. 15, 2016) (same).

Finally, "courts have found exposure and reliance suitable for class-wide resolution in cases where," as here, "the class was defined as all purchasers of a product and the plaintiffs' CLRA and UCL claims were based on information omitted from the product's packaging." *Butler v. Porsche Cars N. Am., Inc.*, No. 16-CV-2042-LHK, 2017 U.S. Dist. LEXIS 59952, at *32–33 (N.D. Cal. Apr. 19, 2017). "In these cases, all class members were 'necessarily exposed' to the defendant's omissions on the package prior to purchase, and all class members would have been aware of a disclosure on the packaging had a disclosure been made." *Id.* (citing *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1105 (C.D. Cal. 2015) (collecting cases)). Crocs had many opportunities to disclose the shrinkage defect to Plaintiffs and prospective purchasers, including on Product labels and Product webpages, prior to purchase, but failed to do so. It also had the opportunity to significantly mitigate the issue, but it chose not to. This common evidence will predominate over any individualized issues between consumers.

### 3.     Common Questions Predominate on Restitution and Damages.

Plaintiffs seek restitution under the UCL, as well as damages for breach of implied warranty, violations of the FAL and CLRA, and for fraud, presenting further predominant common questions. Pursuant to *Comcast v. Behrend*, 133 S. Ct. 1426 (2013), Plaintiffs must show that damages are "capable of measurement" across the class and that their damages model "is consistent with" their theory of liability. *Id*. at 1435. "[C]lass action plaintiffs may rely on a reliable though not-yet-executed damages model to demonstrate that damages are susceptible to common proof so long as the district court finds that the model is reliable and, if applied to the proposed class, will be able to calculate damages in a manner common to the class at trial." *Lytle v. Nutramax Labs., Inc.*, No. 22-55744, 2024 U.S. App. LEXIS 9722, at *4 (9th Cir. Apr. 22, 2024); *see also Maldonado v. Apple, Inc.*, 333 F.R.D. 175, 191–92 (N.D. Cal. 2019) (certifying consumer class because plaintiff presented a viable damages model and "calculations need not be exact, nor is it necessary to show that [the] method will work with certainty at this time") (cleaned up). Moreover, variations in damages among class members is not a reason to deny certification. *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015).

As explained above, Plaintiffs, like all Class members, were injured when they bought Products with an undisclosed, latent defect. All Class members were injured in the same way "by paying a price premium for a [product] with the . . . defects when a reasonable consumer would expect to receive a [product] without . . . defects." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. at 349. Here, Plaintiffs' survey and economics experts, Mr. Gaskin and Mr. Weir,[12] propose a conjoint damages model to show the price premium class members paid for the Products as a result of the defect and omission. *See* Weir Decl. ¶45 and Gaskin Decl. ¶¶10, 24, 52; *see also Kaupelis*, 2020 U.S. Dist. LEXIS 186249, at *17 ("Conjoint analysis 'has been used for decades as a way of estimating the market's willing[n]ess to pay for various product features.'"). Plaintiffs' theory of liability is that the Products were defective because they can shrink a full size (or more) in hot environments, including in direct sunlight, and that Defendant did not reveal this information at the point of sale, which allowed Defendant to charge consumers more for its Products than it could have had it disclosed the defect. ECF 33 ¶¶3, 10, 26, 119, 130. In the product defect

---

[12] Numerous courts have accepted Mr. Gaskin and Mr. Weir as damages experts. *See* Weir Decl., ¶2; Gaskin Decl. ¶13.

1    context, a damages model satisfies *Comcast* when it measures the difference in value between a product

2    with the omitted defect versus one without the omitted defect, as numerous courts have recognized. *See In*

3    *re Arris Cable Modem Consumer Litig.*, 327 F.R.D. at 349; *Johnson*, 2022 U.S. Dist. LEXIS 131657, at

4    *72 (finding that a conjoint that "determine[s] the price premium for a nondefective vehicle over a defective

5    one to a consumer" satisfies *Comcast*); *Kaupelis*, 2020 U.S. Dist. LEXIS 186249, at *17–18 (same);

6    *Sonneveldt v. Mazda Motor of Am., Inc.*, No. 8:19-cv-01298-JLS-KES, 2022 U.S. Dist. LEXIS 219297, at

7    *66 (C.D. Cal. Oct. 21, 2022) ("Here, the injury alleged is overpayment based on a failure to disclose a

8    defect. Conjoint analysis adequately ties the theory of harm, the omission, to the damages, the reduction in

9    value caused by the alleged defect.").

10          Conjoint analysis has been used for over 50 years by academic researchers, industry marketing

11   departments, and government agencies to determine the price premium attributable to particular product

12   attributes, such as the absence of warnings. *Hadley*, 324 F. Supp. 3d at 1103 (finding conjoint analysis

13   sufficient). Numerous courts have also approved of conjoint analysis as a methodology to determine the

14   price attributable to specific product features, including defects. *See In re Arris Cable Modem Consumer*

15   *Litig.,* 327 F.R.D. at 349; *Johnson*, 2022 U.S. Dist. LEXIS 131657, at *72; *Sonneveldt*, 2022 U.S. Dist.

16   LEXIS 219297, at *66; *Kaupelis*, 2020 U.S. Dist. LEXIS 186249, at *17–18; *see also Lytle*, 2024 U.S.

17   App. LEXIS 9722, at *38–39; *Bailey v. Rite Aid Corp*., 338 F.R.D. 390, 408–410 (N.D. Cal. Apr. 28, 2021)

18   (finding that conjoint comported with requirements of *Comcast* and was sufficient to show damages are

19   capable of measurement on a class-wide basis); *Hadley*, 324 F. Supp. 3d at 1103 (same).[13]

20          The survey here, designed by Mr. Gaskin, accounts for the real-world marketplace for the Products,

21   and was based on actual, historical prices that occurred in the marketplace. Gaskin Decl. ¶¶24, 26; Weir

22   Decl. ¶¶40, 52, 65–66. Mr. Gaskin used actual competitor brands (identified by Crocs), actual brand

23   attributes for those competitors, and actual price ranges for those competitors' products. *Id*. ¶¶27, 46.

24

25   _____

     [13] Even were the Court to conclude that there is no classwide method for determining the amount of
26   monetary relief that should be repaid to the Class, it nonetheless should certify the Class to seek injunctive
     relief under Rule 23(b)(2). An injunction is "the primary form of relief available under the UCL to protect
27   consumers from unfair business practices." *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017). Rule
     23(b)(2) permits certification where the defendant "has acted or refused to act on grounds that apply
     generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate
28   respecting the class as a whole" and is available without the need to establish predominance. *Wal-Mart*,
     564 U.S. at 362–63. Plaintiffs seek an injunction requiring Crocs to disclose the defect on the Product label.

1   Following well-accepted techniques for conjoint surveys, respondents will be shown a variety of similar

2   bread clog products that vary according to the product attributes tested: Brand, heel straps, arch support,

3   breathability, color fastness, size stability, and price. *Id*. Respondents will choose their preferred product

4   based on the displayed attributes, which will be presented in sets of three products. *Id*. ¶¶46–47. After each

5   choice set, respondents will be asked if they would actually purchase the product they state they preferred.

6   *Id*. ¶48. Mr. Gaskin will then able to take the preference data and feed it into a market simulator that

7   employed Hierarchical Bayesian regression to calculate the price premium that consumers paid as a result

8   of the omitted defect. *Id*. ¶¶50–52. Mr. Weir will then calculate damages by multiplying the price premium

9   by the sales of the Products during the class period. Weir Decl. ¶69. Because the price premium is expressed

10  as a percentage or amount of the sales price that applies equally to every class member's purchase of the

11  Products during the class period, damages are capable of measurement on a classwide basis. *Id*.; *see also*

12  Gaskin ¶ 52; *see also Lytle*, 2024 U.S. App. LEXIS 9722, at *16–17.

13  **4.      A Class Action is Superior.**

14          Rule 23(b)(3) enumerates four factors to consider on "superiority": "(A) the interest of members of

15  the class in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of

16  any litigation concerning the controversy already commenced by . . . members of the class; (C) the

17  desirability . . . of concentrating the litigation of the claims in the particular forum; (D) the difficulties

18  likely to be encountered in the management of a class action." Here, there is little to be gained by class

19  members filing individual claims because the price of Crocs is relatively low compared to the costs of

20  litigation. Judicial resources, too, would be conserved by concentrating the action in a single suit. Finally,

21  the adjudication of class claims would not be significantly more burdensome than if the matter were

22  prosecuted individually, while the prosecution of individual remedies could establish inconsistent standards

23  of conduct for Crocs. Accordingly, a class action is a superior method to adjudicate the claims of the Class

24  and Subclass. "[A] class action has to be unwieldy indeed before it can be pronounced an inferior

25  alternative . . . to no litigation at all." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

26  **IV.    CONCLUSION**

27          Plaintiffs respectfully request that the Court certify the Class and Subclass, appoint Plaintiffs as

28  class representatives, and their counsel as class counsel.

1   DATED: May 31, 2024

2                                                **GUTRIDE SAFIER LLP**

3                                                *s/ Kali R. Backer*
                                                 Seth A. Safier (State Bar No. 197427)
4                                                  seth@gutridesafier.com
                                                 Anthony J. Patek (State Bar No. 228964)
5                                                  anthony@gutridesafier.com
                                                 Kali R. Backer (State Bar No. 342492)
6                                                  kali@gutridesafier.com
                                                 100 Pine Street, Suite 1250
7                                                San Francisco, CA 94111
                                                 Telephone: (415) 639-9090
8                                                Facsimile:  (415) 449-6469

9

10                                               Patrick J. Branson (*pro hac vice*)
                                                   patrick@gutridesafier.com
11                                               305 Broadway, 7th Floor
                                                 New York, NY 10007
12                                               Telephone: (415) 639-9090
                                                 Facsimile:  (415) 449-6469
13

14                                               *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28